(No. 18202.—

HERMAN WOLLENBERGER *et al.* Defendants in Error, *vs.* IRA J. HOOVER *et al.*—(OSCAR RUBIN, Plaintiff in Error.)

*Opinion filed December 17, 1931.*

GRANVILLE W. BROWNING, CLARK & CLARK, and EDWARD M. KEATING, for plaintiff in error.

CHARLES H. ALDRICH, CHESTER D. KERN, (CHARLES LEROY BROWN, JACOB LOGAN FOX, and NATHAN S. BLUMBERG, on rehearing only,) for defendant in error Herman Wollenberger; HENRY M. HAGAN, for defendant in error Henry B. Staver; JAY STOUGH, for defendants in error Anna M. Larson, (individually and as administratrix of the estate of Evans Larson,) Dorothy Larson Nevans, and Helen Larson, a minor.

CUTTING, MOORE & SIDLEY, (CHARLES S. CUTTING, and EDWIN C. AUSTIN, of counsel,) for the Indemnity Insurance Company of North America.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Herman Wollenberger filed a bill in the circuit court of Cook county on June 3, 1921, the prayer of which was that a deed executed by Ira J. Hoover dated March 8, 1921, to Anna Pritikin, a trust deed of the same date from Anna Pritikin to David K. Cochrane, and a deed of Anna Pritikin dated March 10, 1921, to Oscar Rubin, all conveying the Lafayette apartment building, which was described in

the bill, and all releases executed and delivered by the complainant or Wollenberger & Co. to Evans Larson, Larson & Co. and the Larson Construction Company may be canceled and the title to the property described in such deeds and trust deed re-invested in Hoover subject to the payment by him of the balance due the complainant under the agreements under which Hoover held title; that the amount due complainant for the balance of the purchase price for the Lafayette building be established by the decree of the court; that a lien be declared for the remainder of complainant's purchase money against said building; that an account of the receipts from the income of the property by the defendants, or any of them, be taken, and that they be decreed to pay the same; and that the interests of all the defendants who furnished supplies or furnishings for the building be established with reference to the lien of complainant, to the end that all valid indebtedness created with respect to said matters may be paid, for a receiver, for an accounting, for an injunction and for general relief. Evans Larson, Larson & Co., the Larson Construction Company, Anna Pritikin, David K. Cochrane, Hoover, Rubin and others were made defendants to the bill. Answers and cross-bills were filed by the defendants, issues were joined, and after reference and re-references to a master, the taking of evidence and the reports of the master, the cause was heard by the chancellor and a decree was rendered granting relief to complainant. Oscar Rubin has sued out a writ of error to reverse the decree.

*Second*—The litigation arose out of the following facts averred in the bill and shown by the evidence: The complainant was the principal stockholder and president of Wollenberger & Co., a corporation of the State of Delaware, having its principal place of business in Chicago and engaged principally in the mortgage banking and brokerage business, which prior to January 9, 1920, on the request of the complainant, had advanced money to finance certain

building operations of Evans Larson, who was a contractor engaged in building in Chicago. Through such advancements Larson had acquired certain properties, the title to which had been taken in his own name or the names of others for his use, subject to such advancements as had been made by Wollenberger & Co. at the instance of the complainant. Because of his ownership of several apartment buildings described in the bill and the indebtedness incurred in their purchase and erection Larson's financial affairs were involved, judgments had been recovered against him, mechanics' liens had been taken against and receivers had been appointed for some of the buildings, and disputes had arisen between Wollenberger & Co. and Larson and between the complainant and Larson which the parties desired to settle. Therefore, on January 9, 1920, the complainant and Larson entered into a written agreement for the conveyance of certain apartment buildings, known as the Clarke, the Carmen and the Magnolia buildings, to John J. Rahlf, and an apartment building known as the Lafayette building to William S. Miller, all to be held under the contract for the benefit of the complainant and Larson; that the indebtedness of Larson, of Larson & Co. and of the Larson Construction Company, and all mechanics' liens and other charges against such apartment buildings, should be advanced by Wollenberger & Co., not exceeding $15,000, and the net proceeds arising from the sale or disposition of the buildings, after providing for matters contained in the prior provisions of the contract, should be divided equally between the parties, one-half to the complainant and one-half to Larson, deducting first from the shares coming to Larson the indebtedness due or to become due under the contract from Larson to Wollenberger & Co. The agreement provided for the formation of a corporation under the laws of Illinois to take the title to the Lafayette apartment building, and for one-half of the stock to be issued to the complainant and one-half to Larson, the

stock, when issued, to be delivered to Wollenberger & Co. and held in escrow for the benefit of the parties, subject to the terms of the contract and as collateral for all advances made by the complainant and Wollenberger & Co. to Larson. The corporation was to have the right to issue a series of first mortgage bonds secured by mortgage on the Lafayette building to the amount of not less than $150,000, for the purpose of refunding the indebtedness against the building. Larson was to have the exclusive right until January 1, 1921, to sell the Clarke building at a minimum price of $30,000, the Carmen building at the minimum price of $40,000 and the Magnolia building at the minimum price of $50,000. The buildings were conveyed to Rahlf and to Miller in accordance with the agreement, but it is contended by the complainant that after the execution of the contract Larson refused to sell the Clarke, Carmen and Magnolia buildings at prices alleged by the complainant to be advantageous to the parties or to co-operate in the organization of a corporation to manage or sell the Lafayette building. In consequence the complainant and Wollenberger & Co. on June 17, 1920, filed a bill in the superior court against Larson, Rahlf and Miller for an accounting, which was still pending when the bill in this case was filed.

*Third*—The other allegations in the bill are substantially the following: While the bill of June 17, 1920, was pending, Larson caused Hoover to be introduced to the complainant as a man of great wealth, and proposed to the complainant that instead of disposing of the premises mentioned in the contract of January 9, 1920, in the manner agreed upon, a price should be fixed upon the properties that would be satisfactory to the complainant and Larson and the title should be vested in Hoover. Hoover confirmed the representations made to the complainant that he was the president of the Bankers' Mortgage Company of Kansas City, and stated that he was in such a position that he could command the large resources of that company to

carry out his projects and that he was in such relation to Larson that he could secure his assent in all respects thereto, and, relying on these representations, the complainant agreed that title to three of the buildings, the Clarke, the Carmen and the Lafayette, should be vested in Hoover. Thereupon a contract in writing was entered into between Hoover and the complainant on October 1, 1920, by which Hoover agreed to purchase from the complainant the three buildings for $292,375 and to place a loan on the Lafayette building for $150,000, dated October 1, 1920, payable in annual installments, secured by a trust deed on the building executed by Hoover to the Chicago Title and Trust Company, as trustee. The complainant relied on the representations made to him by Larson and Hoover and was deceived both as to Hoover's financial responsibility and his personal character. In reliance upon such representations he entered into the contract of October 1, 1920, and caused the title of the three buildings mentioned in the contract of January 9, 1920, to be conveyed by the trustees, Rahlf and Miller, to Hoover, subject to a trust deed given to secure an unpaid balance of $19,000 on the Clarke building and subject to a trust deed to secure an unpaid balance of $22,000 on the Carmen building, and caused Wollenberger & Co. to offer and sell to the public an issue of $150,000 of first mortgage real estate seven per cent serial gold bonds, maturing as follows:

| Amount | Due Date | Denominations |
|--------|----------|---------------|
| $15,000 | November 1, 1921 | $1000 |
| $15,000 | November 1, 1922 | 1000 |
| $10,000 | November 1, 1923 | 1000 |
| $10,000 | November 1, 1924 | 500 |
| $10,000 | November 1, 1925 | 500 |
| $10,000 | November 1, 1926 | 100 |
| $80,000 | November 1, 1927 | 500 |

*Fourth*—Hoover agreed to execute, and did execute and deliver to the complainant, a second trust deed on the Clarke building to secure the sum of $10,000, $2000 of which was payable on or before August 1, 1921, and $8000 thereof was payable on or before August 1, 1922, with interest at the rate of seven per cent per annum, payable semi-annually, and he agreed to execute, and did execute, a second trust deed and notes to the complainant on the Carmen building to secure the sum of $15,000, $2500 of which was payable on or before August 1, 1921, and $12,500 thereof was payable on or before August 1, 1922, with seven per cent interest, payable semi-annually. Hoover received a conveyance of the properties subject to the liens specified in the contract of sale of October 1, 1920. He afterward sold the Carmen and Clarke properties, and there was on December 9, 1920, applied on the amount due the complainant the sum of $4999.35, the earnest money that had been deposited by Hoover by cashier's check with the Chicago Title and Trust Company, less sixty-five cents for cashing the same, and $5000 and $7352.83 received from the sale of the Carmen and Clarke properties, the first mortgage bond issue of $150,000, the mortgages on the Carmen building of $22,000 and $15,000 and on the Clarke building of $19,000 and $10,000, leaving due the complainant, without interest, the sum of $56,451.11, to which were to be added sums paid in adjustment of taxes, insurance and other matters mentioned in the contract of sale, making the total consideration named in the contract. The complainant believed Larson's representations that Hoover was a man of great wealth and a gentleman of high standing and unimpeachable character, that he was at that time president of the Bankers' Mortgage Company of Kansas City, and that his obligations, secured by trust deed, would be valid and collectible against him independently of the security under the trust deed. In advertising and selling the bonds secured by the Lafayette building the complainant made statements of

the truth of these representations to the buying public. He was ignorant, although it was the fact, that Hoover was a man of no financial standing, that no debt of any amount could be collected by legal process against him, and that he had been discharged or had withdrawn as president of the Bankers' Mortgage Company of Kansas City and was no longer actively connected with that company. About February 15, 1921, the complainant discovered the actual standing, moral and financial, of Hoover, but he had prior to that time learned that Larson would have an interest in the properties sold to Hoover after Hoover was re-paid all his advances on them, including the amount due the complainant for the balance of the purchase price, and he learned about February 15, 1921, that there was a written contract between Hoover and Larson executed with the purpose and intent of vesting the title in Hoover for the use of Larson. Larson knew of Hoover's insolvency and knew that the representations made concerning his personal and financial character and relation to important financial institutions were false.

*Fifth*—Having large amounts of money invested in the properties and having reached a deadlock with Larson, who refused to go on under the contract of January 9, 1920, the complainant consented to the conveyance of the properties to Hoover, and instead of holding a fifty per cent interest in the equity of the properties, subject to the payment of the indebtedness thereon, he decided to liquidate the interests of himself and Wollenberger & Co. by agreeing upon a stated sum which he should receive under the contract of sale. He therefore accepted the purchase price named in the contract of sale in lieu of his fifty per cent interest in the properties, he having confidence that Hoover would not convey or encumber the property without paying the balance of the agreed price and would manage the properties honestly. Hoover was about December 9, 1920, indebted to the complainant in the sum of $73,803.29 for

the purchase price of the properties under the contract of sale of October 1, 1920, with adjustments provided in the contract, and proposed about December 1, 1920, that he should execute his promissory note for that amount to the complainant, promising that he would not sell or convey or encumber the Lafayette building without consent of the complainant, and then only under such conditions as would enable him to pay the balance of the purchase money. The complainant accepted said note December 9, 1920, as an accommodation note for his own benefit, to be held and redelivered to Hoover upon payment thereof or of his finding a purchaser who would do so. Hoover sold the Clarke and Carmen properties subject to the liens thereon and applied the earnest money received by him from the Chicago Title and Trust Company and the profits of the sale of the buildings over and above such liens to the reduction of the amount named in the note, by endorsing three credits on it, to-wit, $4999.35, $5000 and $7352.83, leaving the balance due for purchase money the sum of $56,451.11, as heretofore stated. Hoover and Larson, conspiring with the defendants Anna Pritikin, David K. Cochrane and Oscar Rubin, who all knew the true relations of Hoover to the Lafayette building and who knew or had notice of the interest of the complainant in that building and with the intent of defrauding the complainant and Wollenberger & Co. out of the balance due them for purchase money, on March 8, 1921, executed, or caused to be executed and delivered, a quit-claim deed to Anna Pritikin by Hoover for the Lafayette building; that Anna Pritikin on the same date and as part of the same transaction and for the same purpose executed and delivered to Cochrane, as trustee, and to his successors in trust, a trust deed upon the Lafayette building and all things appertaining thereto, subject only to an encumbrance to the Chicago Title and Trust Company, trustee, given to secure said bonds of $150,000 and purporting to secure thirty-four principal promissory notes

bearing the same date, aggregating $90,000, payable as follows: Ten $1000 notes, one due on the first day of each consecutive month, beginning May 1, 1921; one for $12,000 due May 1, 1921; twenty-two for $3000, one due every three months, beginning June 1, 1922, and one for $2000 due December 1, 1927, all bearing interest at the rate of seven per cent per annum from date; that as a part of the same conspiracy and transaction Anna Pritikin on March 10, 1921, gave a warranty deed to said building to the defendant Oscar Rubin, and in furtherance of the same scheme and as part of the conspiracy to defraud the complainant, Larson and wife, Anna Marie Larson, did by a quit-claim deed, for a pretended consideration of ten dollars, convey the same premises to Rubin; that Anna Pritikin was a mere tool of the conspirators, and has, and had at the date of the deed to her, no financial responsibility and paid no consideration therefor but did all of the acts as the agent and dummy of persons who had full knowledge and information of the true relation of Hoover to the building and of the rights of the complainant therein; that Rubin did not pay any good and valuable consideration, or any consideration whatever, for the building; that he is a man of very little resources and had full knowledge of the plan and purpose of Larson and Hoover and the other defendants named, in the scheme to defraud the complainant as before stated; that it was the plan and purpose of the conspirators to enter into possession of the building and seize and appropriate to themselves the rents thereof, and if any consideration had been paid it was their purpose that such consideration should be recouped and paid from the rents so collected by Rubin, or some agent in his behalf, from the tenants occupying said building.

*Sixth*—By the terms of the trust deed executed by Hoover to the Chicago Title and Trust Company about October 20, 1920, it is provided that beginning on November 1, 1920, and on the first day of each of the eleven

months immediately succeeding thereafter, the mortgagor shall deposit with Wollenberger & Co. at Chicago, for the account of the bondholders, a sum of money which shall be equal to one-twelfth of the total annual interest charges for the year beginning November 1, 1920, and ending October 31, 1921, and thereafter, during each year of the indebtedness, shall deposit in equal monthly payments on the first day of each month, beginning November 1, 1921, one-twelfth of the total annual interest charges falling due within such yearly periods, respectively, and deposit on November 1, 1920, and on the first day of each of the eleven months immediately succeeding thereafter, a sum which shall equal one-twelfth of the principal due November 1, 1921; that the payments required by the covenants of the trust deed have been paid to and including the month of February, 1921; that Hoover and his co-conspirators failed and refused to make the further payments required, and that by the refusal to make the payments due in March, April, May and June, 1921, amounting to the sum of $8500, and by the refusal to pay the taxes due to the amount of $2526.26, there is a default on the first mortgage; that Hoover, Larson and Anna Pritikin are insolvent and unable to respond in damages and Rubin is wholly unable to pay the amount he has collected from the building in rents; that the rents accruing from the building amount, approximately, each month to the sum of $7550; that David K. Cochrane, a man of small means, is one of the lawyers for the defendants and one of the conspirators; that the complainant will suffer a total loss of the amounts due him unless the court, through its injunction and the appointment of a receiver, prevents a waste of the income and also prevents the further encumbrance and conveyance of the building and the assignment of the notes purporting to be secured by the pretended trust deed of Anna Pritikin to Cochrane and the further collection of the rents and income from the property, and at the time the complainant

delivered the releases to Larson, Larson & Co. and the Larson Construction Company he was ignorant of the fact that Hoover was but the agent or dummy of Larson and did not possess the financial or moral character which he had been led to believe he had, therefore it is just and in accordance with the principles of equity that the releases should be set aside and held for naught. He is not advised what disposition, if any, has been made of the notes purporting to be secured by the trust deed executed by Anna Pritikin to Cochrane, amounting to $90,000, and that they may not get into the hands of innocent holders it is necessary that the defendants herein be enjoined from disposing of the notes or any of them.

*Seventh*—Under article 8, section 1, of the trust deed to the Chicago Title and Trust Company, securing the $150,000 of bonds aforesaid, it is provided that the mortgagor shall at no time commit or suffer to be committed any waste upon the mortgaged property or permit to be done about or upon the mortgaged property anything that may in anywise tend to impair the value thereof or to weaken or impair the value of the security furnished by the trust deed and to fully and in due time comply with all laws and ordinances lawfully applicable to the mortgaged property; that the covenant has not been kept by the mortgagor or those persons who are now in possession of the property, but, on the contrary, since Rubin has had possession and control of the building young girls and women of immoral character have been taken to rooms or apartments in the Lafayette building for immoral purposes, which has resulted in complaints to the police department in the city of Chicago and arrests have been made and several raids have been made by the police force, all of which actions have greatly injured the reputation of the building and will destroy or largely impair its value and do irreparable injury to the complainant as owner in equity of the amount due on the balance of the purchase money, and which is

prior in right to the title of the defendants or any of them; that some controversy had arisen between Larson and Hoover, and by reason thereof Larson on December 4 and on December 30, 1920, filed and had recorded in the office of the recorder of deeds of Cook county affidavits setting out the contract between Hoover and Larson, by which Hoover was shown to have been acting merely as agent of Larson, had paid no consideration for the Lafayette building and had no authority to sell or convey it without consent of the complainant and Larson, which affidavits were on file at the time Hoover pretended to transfer the properties to Anna Pritikin; that Larson also filed a bill against Hoover on March 8, 1921, in the circuit court of Cook county, in which bill the agency of Hoover for Larson is averred and the court is asked to decree the delivery of a proper deed from Hoover to Larson to the Lafayette building, and that on June 17, 1920, the complainant and Wollenberger & Co. filed said bill in the superior court of Cook county against Larson, Miller and Rahlf, in which it is alleged that Miller and Rahlf hold the title to the Lafayette, the Clarke, the Carmen and the Magnolia apartment buildings as trustees for the benefit of the complainant and Larson, as set forth in the contract of January 9, 1920. The interests of Larson and the complainant in the apartment buildings are also set forth in the bill, and it is therein stated that Larson was under contract with the complainant for the sale and disposition of two of the buildings, the Clarke and the Carmen, at certain prices therein agreed on and for the purpose of re-paying the advances made by Wollenberger & Co. to Larson at the instance of the complainant; that the demand for sale and the prices available for the buildings are at their peak, and if not promptly sold and the proceeds of sale thereof applied to the amount due Wollenberger & Co. and the remainder divided between complainant and Larson, any loss by failing to sell while prices for such property are at their best

will fall altogether, or mainly, upon the complainant and Wollenberger & Co. The Magnolia apartment building has been sold, and on sale thereof Larson was entitled to a commission of $1796, as provided by paragraph 4 of the contract; that contrary to the provisions of paragraph 4 of the contract he has refused to turn over to Wollenberger & Co. the sum received as commission, to apply on the indebtedness due to Wollenberger & Co. The prayer of the bill is for an accounting between Wollenberger & Co. and Larson since January 9, 1920, to the filing of the bill and to fix the sum due Wollenberger & Co. under the contract of January 9, 1920; that Larson may be ordered to turn over to Wollenberger & Co. the commission realized from the sale of the Magnolia apartment building, to be applied as required by the fourth paragraph of the contract of January 9, 1920; that Miller and Rahlf be decreed to hold the record title to the other three buildings for the joint benefit of the complainant and Larson, subject to the provisions of the contract; that a sale of the other three above described buildings subject to the encumbrances thereon may be had under the direction of the court; that after applying the proceeds of sale, if the same should be insufficient to pay all costs and Wollenberger & Co. in full under the terms of the contract, a deficiency judgment or decree be rendered in the company's favor against Larson for the amount of such deficiency and that execution issue therefor as at common law, and for other and further relief as equity may require. Before the conveyances by Hoover to Pritikin and by Pritikin to Rubin, dated, respectively, March 8 and March 10, 1921, the complainant and Hoover agreed that the bill of complaint by the complainant and Wollenberger & Co. against Larson and others for an accounting, etc., should not be dismissed, and that the other documents in the hands of the complainant and his attorneys necessary to clear the title to the Lafayette building and procure the guaranty policy on the

same should be delivered, but should likewise be withheld from filing until a purchaser satisfactory to the complainant had been procured, whereupon all of the papers should be filed and the bill should be dismissed and the guaranty policy be taken out and delivered to the purchaser.

*Eighth*—Evans Larson and other defendants filed cross-bills, to which answers were filed and issues were joined. The cross-bills and answers are sufficient to state the respective claims of the parties thereto and to furnish a basis for the introduction of evidence, but it will not be necessary to set out the pleadings or any part of them or discuss them in detail in this opinion, as the documentary proof, taken in connection with the undisputed facts in this case, makes it possible, as stated by the master in chancery in his report, to determine the truth on the issue.

*Ninth*—The contract of January 9, 1920, and the bill of complaint of June 17, 1920, by the complainant and Wollenberger & Co. against Larson and others for an accounting, copies of five other instruments all dated on the same day the contract of sale was signed, October 1, 1920, and also a copy of the provisions of the bonds and of the trust deed to the Chicago Title and Trust Company on the Lafayette building to secure the bonds in the sum of $150,000, dated October 1, 1920, were filed as exhibits to the complainant's bill and made parts of the same. The first of the five instruments is signed by H. G. Howard & Co., who thereby acknowledge that upon, but only upon, the full and complete consummation of the above described contract of sale by the complainant to Hoover, or any change or modification thereof agreed upon by the parties thereto, they will be entitled to receive from the complainant the sum of $8265 in full for their commission in the sale of the Clarke, Carmen and Lafayette buildings to Hoover. They also expressly acknowledged that in the event that the contract of sale, or some change or modification thereof agreed upon by the parties to the contract of sale, for any reason what-

ever is not fully and completely consummated and the consideration fully and completely paid to the complainant, then and in such case they shall not be entitled to receive any commission whatsoever.

*Tenth*—One of said five instruments was signed by Evans Larson and Anna Marie Larson, his wife, which provided that in consideration of ten dollars paid to them and of the execution by the complainant and Hoover of the contract of sale they consented to all the terms and agreements of the contract of sale and agreed to perform all the terms, provisions, covenants and conditions thereof on the part of the complainant to be done and performed, in which instrument it was recited that it was to be understood that the Larsons should not share in the benefits or purchase price of the contract of sale, which should run to and be paid to the complainant, only. Another of said five instruments was executed by the complainant and Larson, which recites that on January 9, 1920, the complainant and Larson entered into a written contract setting forth their respective rights in the Lafayette, the Carmen and the Clarke apartment buildings; that subsequent to the date of the contract of January 9, 1920, controversies and disputes arose between the parties, and the complainant and Wollenberger & Co. thereafter filed their bill of complaint in the superior court of Cook county against Larson and others, praying for an accounting and for other relief; that the complainant has this day, October 1, 1920, entered into a written contract with Hoover for the sale to Hoover of the three apartment buildings on the terms and conditions set forth in the contract of sale, and Larson and Anna Marie Larson, his wife, have assented to and joined in the execution of the contract of sale, and that the complainant and Larson desire to enter into an agreement for completely adjusting and settling all their controversies and disputes, to take effect as of the date of the consummation of the contract of sale between the complainant and Hoover. Therefore,

in consideration of the payment by each party hereto to the other of the sum of one dollar and of the mutual covenants and stipulations hereinafter contained, and which are set forth in eleven paragraphs and numbered First to Eleventh, which covenants and stipulations they hereby agree that they have performed or will perform, to-wit: First, they have authorized in writing William S. Miller and John J. Rahlf, who hold title to the Lafayette, the Carmen and the Clarke buildings for the mutual benefit of the complainant and Larson, to convey the three buildings to Hoover; second, the complainant and Wollenberger & Co. have executed general releases to Larson, Larson & Co. and the Larson Construction Company, and at the same time Larson and Anna Marie Larson, his wife, Larson & Co. and the Larson Construction Company have executed general releases to the complainant and Wollenberger & Co.; third, Larson and Anna Marie Larson, his wife, have executed to the complainant an assignment of all their right, title and interest in and to a certain claim against Chandler, Hildreth & Co.; fourth, Larson and his wife, Anna Marie Larson, shall execute their quit-claim deeds conveying the three buildings to Hoover and shall deliver the same for recording to the Chicago Title and Trust Company; fifth, Larson and his wife have also executed releases running to Miller and Rahlf, respectively; sixth, within five days from this date, October 1, 1920, Larson shall cause to be paid and satisfied of record a certain judgment rendered against him in the superior court of Cook county in favor of Fred J. Trimble, and shall pay and satisfy within said five days any judgment or other liens against the premises suffered or permitted by him to accrue since January 9, 1920; seventh, each of the parties to this contract, the complainant and Larson, shall deliver such instruments, documents, releases and papers in his possession or control as shall be requisite or necessary to carry out the sale contemplated by the contract between the complainant and

Hoover and shall execute and deliver such other instruments as may be required or necessary for the same purpose, and Larson agrees to use his best efforts to clear the titles to all of the three buildings covered by the contract of sale to Hoover; eighth, Larson and his wife, Anna Marie Larson, have executed their quit-claim deed conveying to the complainant all their right and title in and to lots 2, 3, 4 and 5 in block 6 in William L. Wallen's addition to Rogers Park, in Cook county, Illinois; all of paragraphs second, third, fifth and eighth contain the further provisions that the instruments named therein, together with this contract between the complainant and Larson, shall be deposited in escrow with the Chicago Title and Trust Company as depositary and held by it until the full and complete consummation of the contract of sale between the complainant and Hoover, and upon consummation thereof said instruments shall be delivered to the parties to whom they run; ninth, upon the full and complete consummation of the contract of sale between the complainant and Hoover the contract of January 9, 1920, between the complainant and Larson, and all obligations thereunder, shall be considered canceled and annulled; tenth, Larson shall deliver to the Chicago Title and Trust Company, for recording, two certain quit-claim deeds from Ernest Fifer conveying to Miller and Rahlf, respectively, the Lafayette and Carmen buildings; eleventh, in the event that the contract of sale contemplated by the contract between the complainant and Hoover is not consummated, then this contract between Larson and the complainant shall be null and void, and, together with the documents deposited with it, shall be destroyed by the depositary or permanently held by it at its option, and thereupon the contract of January 9, 1920, shall be and remain in full force and effect.

*Eleventh*—On October 1, 1920, the date of the contract between the complainant and Hoover for the purchase of the buildings by Hoover, Larson and Hoover executed a

written agreement which recited that Hoover, at the request of Larson, was about to execute certain instruments regarding the purchase from the complainant of the Lafayette, Carmen and Clarke buildings and to lend Larson $5000, and in such purchase was acting for Larson, who had agreed to compensate him. It continued, that therefore it was agreed that Hoover would execute a contract for the purchase of such properties from the complainant, dated October 1, 1920, and upon its execution would hand Larson a cashier's check on the First National Bank of Kansas City for $5000, payable to Hoover's order and endorsed by him to the Chicago Title and Trust Company; that at the same time Larson would execute to Hoover two promissory notes for the aggregate sum of $8000, payable November 1, 1920, being for Hoover's protection on the loan and as compensation for the execution of the contract and the other instruments mentioned in the contract. These notes were secured by certain collateral mentioned in the contract and delivered to Hoover. It was further agreed that Hoover would execute, at the request of Larson, the instrument required to be executed by the purchaser under the contract of sale and such instruments as might be required under the contract of sale made by Larson with Daniel Burkey for the sale of the Lafayette building, and as a protection for Hoover by reason of the execution of the contract and instruments referred to, Larson agreed to hold Hoover harmless from any loss or liability upon them. The contract of purchase from the complainant of the Lafayette, Carmen and Clarke apartment buildings, together with the cashier's check for $5000 as soon as executed, was to be deposited with the Chicago Title and Trust Company, to be held and used as earnest money according to the terms of the contract of sale. The contract further provided that in the event Burkey should fail or refuse to carry out the contract now in escrow with the Harris Trust and Savings Bank, and Hoover shall elect personally, from his own re-

sources, to supply all the funds necessary to consummate the contract of sale between the complainant and Hoover of the apartment buildings, then the parties to this agreement shall each have a half interest in the apartment buildings, and shall divide the income and net proceeds of any sale thereof on the basis of fifty-fifty, after the re-payment to Hoover of all advances and payments made by him in carrying out the contract of sale with the complainant or subsequently made in the care of the apartment buildings. If Larson, in case of the failure of the Burkey contract, shall supply any portion of the funds necessary to carry out the contract of sale or to obtain the complainant's interest in the buildings, the said fifty per cent interest in the properties, or the income or proceeds thereof which may come to Hoover, shall be reduced proportionately.

*Twelfth*—The fifth instrument aforesaid, which was made a part of the bill of complaint as an exhibit, is the contract of sale between the complainant and Hoover. The contract has been performed in so far as it pertains to the Clarke and Carmen buildings and as to the earnest money deposited with the depositary, and in so far as the contract relates to the Lafayette building the agreements of the complainant and Hoover are the following: The complainant agrees, as part of the consideration of the contract, to make a loan on the Lafayette building for the sum of $150,000 in bonds dated October 1, 1920, with interest at seven per cent per annum, payable semi-annually, and the bonds are payable in annual installments, as heretofore stated, all to be secured by a trust deed to be signed by Hoover to the Chicago Title and Trust Company, as trustee, which shall contain a clause requiring Hoover to deposit monthly, in advance, with the complainant or Wollenberger & Co., one-twelfth of the annual interest and annual principal payments. The complainant by this contract agrees to sell the buildings at the price of $292,375, and to convey, or cause to be conveyed, to Hoover a good and merchantable

title thereto by a good and sufficient deed, with release of dower and homestead rights, but subject to existing leases expiring at various dates and to all general taxes levied after the year 1919 and to any unpaid special taxes or special assessments levied for improvements not completed on October 1, 1920, and also subject to any party-wall agreements of record and to building line restrictions and building restrictions of record, and Hoover shall be entitled to rents accruing after October 1, 1920, and the taxes for the year 1920 shall be prorated from January 1, 1920, to October 1, 1920. Premiums on insurance policies held by mortgagee shall be paid by Hoover *pro rata* from October 1, 1920, for the unexpired term. The interest on encumbrances, rents, water taxes and insurance premiums shall be adjusted *pro rata* as of October 1, 1920. The coal on the premises on October 1, 1920, shall be purchased by Hoover. Hoover further agrees to pay the insurance premiums and other *pro rata* adjustments chargeable to him, and the further sum of $71,375, at the office of the Chicago Title and Trust Company, provided a good and sufficient deed conveying to Hoover a good and merchantable title to the premises, subject as aforesaid, shall then be ready for delivery. The complainant further agrees, within a reasonable time from the date of the contract, to furnish Hoover a guaranty policy by the Chicago Title and Trust Company, in its usual form, which shall, upon the consummation of the sale, remain with the complainant or his assigns as part of his security until the deferred installments are fully paid. The complainant also agrees to pay to the firm of H. G. Howard & Co. a commission of $8265 upon, and only upon, the full and complete consummation of the contract of sale, and in the event that for any reason the contract of sale be not fully and completely consummated there shall be no liability upon the complainant to pay any part of the commission. It is further stated in the contract that the expenses in connection with the bond issue

of $150,000, and the trust deed securing the same, shall be borne by the complainant. Hoover was to have until November 1, 1920, if necessary, to consummate the contract of sale, and the contract provided that if he shall fail to perform it promptly on his part and in the manner specified the contract shall become null and void, and that the contract shall be held by the Chicago Title and Trust Company, as depositary, for the mutual benefit of the parties, and after the consummation of the sale the depositary shall be at liberty to retain the canceled contract permanently.

In the foregoing paragraphs of this opinion the second to the seventh, inclusive, and in the ninth to the twelfth, inclusive, we have set forth substantially all the material allegations in the complainant's bill of complaint so far as they pertain to the rights and claims of the complainant or of the defendants contesting the same under this writ of error, except those allegations pertaining to the provisions of the bonds, and of the trust deed on the Lafayette building securing the bonds in the sum of $150,000. The provisions of the bonds and of the trust deed, the consideration of which is necessary to a correct decision in this case, will be noted when we come to the consideration of the rights and duties of the complainant under the provisions of the bonds and trust deed.

To sustain the extraordinary decree rendered by the circuit court of Cook county for the complainant in this case and against various defendants, counsel for the complainant, Herman Wollenberger, appear to rely very greatly on the various allegations of fraud against Larson, Hoover, Rubin and other defendants. Under such allegations of fraud there are various conveyances in the record that are apparently set aside merely because alleged to be fraudulent and to which relief the complainant was not entitled by reason of other material allegations in the bill that are inconsistent with such relief. Various fraudulent misrepresentations to the complainant are charged against Lar-

son and his alleged confederates, including Hoover, as to Hoover's wealth and good standing, morally and financially, and as to his ability, as president of the Bankers' Mortgage Company of Kansas City, to carry out his projects, and that his relation to Larson was such that he could secure Larson's assent thereto. It is further charged in the bill that the complainant relied on such representations and was induced thereby to enter into the contract of sale to Hoover of October 1, 1920, of the three buildings aforesaid, and that he was deceived and damaged by reason thereof, and by reason of the alleged fraudulent conveyances by Hoover to Anna Pritikin, and by her to Rubin and others, of the Lafayette building. The record evidence does not sustain the complainant's allegation and claim that he relied on the representations of Larson and his confederates made to him as to the moral and financial standing of Hoover and that he was deceived and defrauded thereby. His own testimony on that question is that he met Hoover three or four years before he entered into the contract of sale with him for the three buildings; that Hoover was then living in Waterloo, Iowa; that some time later, about September, 1920, Louis T. Orr, of H. G. Howard & Co., brought Hoover and introduced him to the complainant as a rich banker from Kansas City, and stated that Hoover wanted to buy the Lafayette, the Clarke and the Carmen buildings; that Joseph O. Morris, attorney for Larson, said to the complainant that Hoover was worth half a million dollars and had a big plantation in North Carolina; that Hoover then presented to the complainant his card as president of the Bankers' Mortgage Company of Kansas City, and "the card said it was a million dollar corporation;" that the complainant then "looked up Hoover" in Bradstreet's Reports, and therein found the statement that Hoover was the president of the Bankers' Mortgage Company of Kansas City, and then said that that report satisfied him. This evidence of the complainant seems to show clearly that he

relied on the report in Bradstreet's Reports concerning the standing of Hoover and not on the reports concerning Hoover given him by Larson through Orr and Morris.

The allegation of the complainant shown in the sixth paragraph of this opinion, to the effect that at the time the complainant re-delivered the releases to the defendants Larson, Larson & Co. and the Larson Construction Company he was ignorant of the fact that there was a contract existing between Hoover and Larson dated October 1, 1920, that showed that Hoover was but the agent or dummy of Larson in the execution of the contract of sale to Hoover from the complainant, and that he did not learn that fact until about February 15, 1921, as alleged in the fourth paragraph of this opinion, are facts not established by the evidence in the record. Isaac E. Glaseman, a witness for the complainant, who was forcibly ejected from the Lafayette building by Larson, who had previously put Glaseman in possession as his tenant, testified that he saw the contract of Larson and Hoover of October 1, 1920, showing that Hoover was only a dummy for Larson in the purchase of the three apartment buildings aforesaid and told the complainant all about the provisions of that contract not later than October 23, 1920; that the complainant then replied to Glaseman, "Pay no attention to that contract. Hoover is the owner of the building and Larson's contract is not worth anything." The complainant did not specifically deny Glaseman's testimony but later testified that the first time he learned that Hoover was not the real purchaser of the buildings was in February, 1921, in the office of his attorney, Judge Aldrich, when Aldrich showed him "a kind of a contract" of Hoover with Larson. Joseph O. Morris, Larson's attorney, testified that the complainant in October, 1920, just after the contract of sale between the complainant and Hoover was made, asked him if Larson did not retain an interest in the contract of sale to Hoover. Morris replied, in substance, that Larson would not part with all

his interest in the buildings without in some way retaining his interest in them, and that Larson did retain an interest in them in his contract with Hoover and was interested with Hoover in any profits that might be realized in the sale of the buildings by Hoover. To this information from Morris the complainant replied: "All right; you are all too smart for me; just so I get my money I don't care how much money he [Larson] makes." As a matter of fact, it is immaterial in the decision of this case whether the complainant first acquired knowledge of the contract between Hoover and Larson in February, 1921, or in October, 1920. The important fact in regard to that matter, which is conceded by the complainant, is, that he obtained complete knowledge of the contract between Larson and Hoover long before he filed his bill of complaint in this case, on June 3, 1921, and according to his own evidence he obtained it through his own attorney, Judge Aldrich, in February, 1921. It is true that the complete title to the buildings was vested in Hoover by the contract of sale by the complainant for his half interest therein, by the deeds of Rahlf and Miller and of Larson and wife, and by the execution of other instruments necessary to place the complete title in Hoover. Nevertheless, Larson did not sell his half interest to Hoover, and Hoover and the complainant have not seriously contended otherwise. It has at all times been recognized that Larson had his half interest in the Lafayette building until he finally disposed of the same by his sale to Rubin and there is no contention otherwise by anyone in this record. It was necessary that the complete title be vested in Hoover so he could obtain the $150,000 loan secured by the trust deed, and the title was so vested for the purpose aforesaid, although he, in fact, purchased only the half interest of the complainant. The bill in this case clearly shows that the complainant sold to Hoover only his half interest and that the entire purchase price of $292,375 was to be paid to the complainant by Hoover and that Larson

was to have no part of the purchase money. Larson's testimony in this case is all to the effect that he did not sell to Hoover his interest in the buildings and at no time intended to do so. The complainant testified that when he sold his interest to Hoover, Larson had a half interest in the properties. It was therefore reasonably necessary that Larson have Hoover, by written contract, recognize the fact that he had an interest in the premises for the protection of his rights, and the complainant had no right to object to such action so long as Larson played fair and practiced no fraud on him by which he might or would be injured. He was not injured in this particular by any alleged fraud of Larson in making his contract of October 1, 1920, with Hoover, and he cannot complain of any such alleged fraud for the reason that he knew all about the alleged fraudulent contract with Hoover months before he filed his bill in this case. He alleges in his bill another important fact set forth in the fourth paragraph of this opinion that precludes him from complaining of any fraud that he has alleged against Hoover and Larson. That fact is, that about February 15, 1921, he discovered the actual standing, moral and financial, of Hoover, and that fact is not denied by him in this record. It therefore appears that after full knowledge of all of the alleged frauds of the defendants practiced against him, he has precluded himself from taking advantage thereof by his election to affirm the contract of sale and to treat it, and all other instruments connected with it and relating to it, as in full force and effect.

The allegations of the complainant's bill set out in the fifth paragraph of this opinion definitely and conclusively show that the complainant sold all his interest in the three apartment buildings to Hoover for the purchase price named in the contract of sale, and that his interest so sold was a "fifty per cent interest in the equity of the properties, subject to the payment of the indebtedness thereon" mentioned in the contract of sale, and that the total indebtedness

claimed by the complainant to be due him from Hoover for the purchase price on December 9, 1920, before the application of the credits aforesaid, was the sum of $73,803.29, "with adjustments provided in said contract of sale." Moreover, the allegations in said paragraph of this opinion and the prayer for relief show just as conclusively that the main relief asked by the complainant is for a decree for the remainder due him for purchase money on the Lafayette building and for the amount due and paid by him of the bonds and coupons secured by the trust deed for $150,000, in the payment of which Hoover and Rubin had made default, and that his bill primarily is simply a bill to foreclose his vendor's lien for purchase money. Every allegation and claim in his bill is in harmony with our conclusion that his bill is a bill primarily for the foreclosure of his vendor's lien, and he nowhere in his bill makes claim for any other relief except as aforesaid, and except also the right to have canceled and set aside the instruments named in the first paragraph of this opinion, and the right to a receiver and an injunction to aid him in the recovery of the main relief sought by him. The complainant as a witness in this case has twice, or oftener, stated that the only interest he has or claims in the Lafayette building is the balance due him for purchase money, and in one of these statements he says, in substance, that this suit is on the contract of sale between him and Hoover for the recovery of the balance due him for such purchase money. His right of recovery and the amount he may recover under his claim for purchase money are necessarily controlled by the allegations of his bill and by the provisions of his contract of sale with Hoover. Inasmuch as he has by his bill of complaint and by his own evidence made his claim in the lower court and confined it to the relief aforesaid, he cannot be allowed in this court to make other and different claims than he made in the lower court. It is elementary that a complainant in a chancery suit cannot make

one case by his bill in the lower court and on a review by a reviewing court be allowed to make another and entirely different one. This court has frequently so declared, and we have also expressly declared that "this court reviews a case presented to the trial court and does not sit to try issues presented for the first time in this court." *Off* v. *Exposition Coaster,* 336 Ill. 100; *Butler* v. *Miller,* 208 id. 231; *Waller* v. *Hildebrecht,* 295 id. 116; *Winnard* v. *Clinton,* 233 id. 320; *Oliver* v. *Oliver,* 179 id. 9.

We have treated the seven instruments described in the ninth to the twelfth paragraphs, inclusive, of this opinion as allegations of the complainant's bill, for the reason that said instruments were filed as exhibits and made parts of the bill of complaint. Five of those instruments, including the contract of sale between the complainant and Hoover, were executed on the same day, October 1, 1920, and at the same time. The first of those five instruments set out in the tenth paragraph of this opinion was signed by Evans Larson and Anna Marie Larson, his wife, in which they expressly consented to all the terms and agreements of the contract of sale between the complainant and Hoover, and expressly stated that it was to be understood that the Larsons should not share in the benefits or purchase price of the contract of sale, which should run to and be paid the complainant, only. This instrument needs no explanation further than the bare statement that it was the complainant, only, that was making the sale to Hoover, and that the sale was only of the complainant's one-half interest in the three properties sold to Hoover. The second of the five instruments is the contract of Larson and the complainant, which recites the fact of the complainant and Larson entering into the written contract of January 9, 1920, and the controversies and disputes that arose between them, which resulted in the complainant filing his bill of complaint for an accounting on June 17, 1920, and in entering into the written contract of sale of the three apartments by the

complainant to Hoover on the terms and conditions set forth in the contract of sale. This contract then expressly states that the complainant and Larson desire to enter into an agreement for completely adjusting and settling all their controversies and disputes, to take effect as of the date of the consummation of the contract of sale between the complainant and Hoover. The contract then sets forth a number of mutual covenants and stipulations thereafter set forth in eleven paragraphs, numbered 1 to 11, which covenants and stipulations they thereby agree they have performed or will perform. We call particular attention to the ninth and eleventh paragraphs of that contract, the ninth of which provides that upon full and complete consummation of the contract of sale between the complainant and Hoover the contract of January 9, 1920, between the complainant and Larson, and all obligations thereunder, shall be considered canceled and annulled. The eleventh paragraph provides that in the event the contract of sale contemplated by the contract between the complainant and Hoover is not consummated, then the contract between Larson and the complainant shall be null and void, and, together with the documents delivered with it in escrow, shall be destroyed by the depositary, and thereupon the contract of January 9, 1920, shall be and remain in full force and effect. We also call attention to the provisions of the contract of sale between the complainant and Hoover referred to in the twelfth paragraph of this opinion and which is in the following language: "Should said purchaser fail to perform this contract promptly on his part, at the time and in the manner herein specified, the earnest money paid as above shall, at the option of the vendor, be retained by the vendor as liquidated damages, and this contract shall thereupon become null and void. Time is of the essence of this contract and of all the conditions hereof." By the provisions of the above quoted paragraph of the contract of sale between the complainant and Hoover, the complain-

ant, as against Hoover and his assigns, had the right to have the contract of sale declared void should Hoover and his assigns fail to perform it promptly at the time and in the manner specified in the quoted paragraph. By the agreement of Larson and the complainant of October 1, 1920, either Larson or the complainant had the right to have the contract of sale between Hoover and the complainant declared null and void and have it destroyed "in the event that said contract of sale" was not consummated, and thereupon the contract of January 9, 1920, between Larson and the complainant should "be and remain in full force and effect." Nevertheless, the complainant has made his election to have the contract of sale remain in full force and effect until long after the alleged fraudulent sales by Hoover to Miss Pritikin and by Miss Pritikin to Rubin, and by his bill of complaint filed June 3, 1921, treats the contract of sale as in full force and effect, and claims thereby only his right to foreclose his vendor's lien and to be paid the remainder of his purchase money and the amount paid by him of the $150,000 bond issue secured by the trust deed to the Chicago Title and Trust Company, except the incidental relief by injunction and the appointment of a receiver, etc., to protect and aid him in securing the main relief that he seeks to recover. Therefore, whatever right he may have had to have the contract of sale declared void as to the Lafayette building and to recover his original interest in that building, and to have the contract of January 9, 1920, between him and Larson come into force and effect, he has waived, and is estopped to claim any right of recovery under the contract of January 9, 1920. His present suit is on the contract of sale, as he has stated in his testimony, and he can recover the main relief sought by him only on the contract of sale and the trust deed securing the bonds and coupons, and the measure of such relief is governed solely by those two instruments, except in so far as the contract of sale may have been modified by

an irrevocable agreement between him and Hoover. Larson's expressed position in this case is that he wants the complainant to recover his purchase money, and he does not object to the complainant treating the contract of sale as in full force and effect. He and the complainant are the only parties to this suit who had the express right to declare the contract of sale void according to the provisions of the contract of October 1, 1920, between Larson and the complainant and the contract of sale by the complainant to Hoover of the same date and which were both executed at the same time.

As a corollary to the proposition that the complainant is entitled to foreclose his vendor's lien and in doing so is bound by the provisions of the contract of sale and has waived his right to have the same declared void and to claim any right of recovery under the contract of January 9, 1920, between him and Larson, Rubin, as the assignee of Hoover, is entitled to claim every right given to Hoover under the contract of sale and to treat that contract of sale as in full force and effect, provided he shall perform all the obligations of Hoover under the contract of sale and pay to the complainant the remainder found due the complainant for purchase money under that contract. We will supplement our statement that the contract of January 9, 1920, between Larson and the complainant is completely annulled in this suit by the pleadings and the evidence thereunder, by the further statement that all other matters and claims and disputes between them since January 9, 1920, and prior to the execution of the contracts and other instruments entered into by them or assented to by them on October 1, 1920, are settled and completely closed and barred from further consideration in this case by the provisions of their contract of October 1, 1920, and by the election of the complainant, assented to by Larson, to confine his right of recovery in this case to the foreclosure of his vendor's lien and to recover the amount he has paid of the $150,000

bond issue secured by the trust deed, which was also executed near the same time as the contract of sale between the complainant and Hoover. It is not possible that the complainant in this case can have any form of relief on the contract of January 9, 1920, between him and Larson, and also at the same time have a lien for purchase money on the contract of sale of October 1, 1920, between him and Hoover, if the contract of October 1, 1920, between him and Larson be considered. This proposition is true because of the provisions of paragraphs 9 and 11 in the contract of the complainant with Larson of October 1, 1920, which are in substance to the effect that if the contract of sale between the complainant and Hoover be consummated or carried out, the contract of January 9, 1920, between the complainant and Larson shall be void, but if the contract of sale between the complainant and Hoover is not consummated or carried out, then the contract of January 9, 1920, between the complainant and Larson shall come into full force and effect and the contract of sale shall become null and void. Hence the election of the complainant to foreclose his vendor's lien bars any right of action under the contract of January 9, 1920, as the foreclosure of the vendor's lien is an election to carry out the terms of the contract of sale.

It is also well established by all the authorities on the subject, so far as our research has been made, that any party who elects to affirm a contract for the sale of real estate by him, or of an interest therein, cannot also have the contract of sale rescinded and the title of the property so sold, or an interest therein, re-invested in him on a charge of a fraud against him by the vendee or his assignee or on any other alleged ground. An election to affirm a contract of sale is entirely inconsistent with an election to rescind it, and when either election is made with full knowledge of the facts the other election is absolutely barred. The law never recognizes the inconsistent claim of a vendor who is defrauded or attempted to be defrauded by his

vendee or assignee to insist on the full payment of his purchase money under a contract of sale and at the same time to insist on the right to have the contract set aside for the fraud practiced on him and the title re-invested in him, but the law does give him the right to elect and have the benefit of either one of those remedies or of any other remedy available to him. As it seems to us, the foregoing propositions are so elementary as to require no argument or citation of authorities to support them. However, the attorneys for the complainant are so insistent that the decree of the lower court decreeing that the complainant shall recover both his purchase money and the property sold by him, which is entirely inconsistent with the propositions of law above stated, should be affirmed, that we deem it proper to set forth the holdings of the courts of this country and of text writers supporting those propositions so far as they have come to our notice.

Where a contract for the sale of land is executed by the making and delivery of a deed by the vendor to the purchaser and the purchaser fails to pay the vendor the purchase price of the land, the vendor may (1) sue in assumpsit for recovery of the purchase price due—*Leake* v. *Brown,* 43 Ill. 372; (2) file a bill in equity to foreclose his vendor's lien—*Palmer* v. *Harris,* 100 Ill. 276; *Wright* v. *Buchanan,* 287 id. 468; (3) sue in assumpsit and proceed in equity to foreclose the lien at the same time—*Palmer* v. *Harris, supra;* if the deed was procured by fraud on the part of the purchaser the vendor may (4) file a bill in equity and have the deed set aside if he has not, after learning of the fraud, ratified the transaction—*Whitney* v. *Roberts,* 22 Ill. 381; (5) sue to recover damages for the fraud and deceit—*Yeomans* v. *Bell,* 151 N. Y. 230, 45 N. E. 552. The remedies 1, 2, 3 and 5 proceed upon the theory that the vendor affirms the sale. The remedy 4 proceeds upon the theory of disaffirmance or repudiation of the sale. If the vendor pursues either of the first three or the fifth

remedy he cannot also pursue the fourth, and if he pursues the fourth remedy he cannot also pursue any one of the first three or the fifth remedy.

"A remedy based on the theory of affirmance of a contract or other transaction is inconsistent with a remedy arising out of the same facts and based on the theory of disaffirmance or rescission, so that the election of either is an abandonment of the other." 20 Corpus Juris, 14, and cases cited.

"If the vendor exercises his option to declare the contract at an end he cannot change his position and thereafter hold the purchaser liable to complete the purchase or pay any part of the unpaid purchase money. The remedy of the vendor by way of cancellation of the contract and the continued liability of the purchaser for the purchase money are totally inconsistent, and the exercise of the former terminates any further liability of the purchaser for the purchase money." 27 R. C. L. 666; *Ogden* v. *Larrabee,* 57 Ill. 389.

"If the party to a contract of sale who has been induced to enter into such contract by fraud or misrepresentation, elects, with full knowledge of the facts, to treat the transaction as valid, he thereby waives his right to avoid the contract for such fraud and misrepresentation, and after such election is made the contract is binding upon him." 39 Cyc. 1293; *LeVine* v. *Whitehouse,* 37 Utah, 260, 109 Pac. 2.

"A vendor who is induced to enter into a contract through fraud on the part of the purchaser may maintain an action for the fraud sustained. He has in such cases an election either to rescind the contract or to sue for damages, but he cannot pursue both remedies or blend the two together, since the former proceeds in disaffirmance and the latter in affirmance of the contract, and he cannot rescind in part and affirm in part." 39 Cyc. 1982; *Yeomans* v. *Bell,* *supra.*

In Pomeroy's Equity Jurisprudence (vol. 2, sec. 897, (1905 ed.) p. 1602,) the following comments on the subject of fraudulent sales are made, followed by a statement of the rule in cases wherein the grantor recognizes the contract as subsisting and binding: "All these considerations as to the nature of misrepresentations require great punctuality and promptness of action by the deceived party upon his discovery of the fraud. The person who has been misled is required, as soon as he learns the truth, with all reasonable diligence to disaffirm the contract or abandon the transaction, and give the other party an opportunity of rescinding it and of restoring both of them to their original position. He is not allowed to go on and derive all possible benefits from the transaction and then claim to be relieved from his own obligations by a rescission or a refusal to perform on his own part. If, after discovering the untruth of the representations, he conducts himself with reference to the transaction as though it were still subsisting and binding he thereby waives all benefit of and relief from the misrepresentations." (See, also, cases cited under this paragraph in note 1*b*.)

In support of the foregoing propositions laid down in Pomeroy's Equity Jurisprudence the author cites the case of *Greenwood* v. *Fenn*, 136 Ill. 146, 26 N. E. 487, which case supports the propositions. This case also lays down the familiar rule that if a party is induced to make a sale of his property or an exchange of properties by the false and fraudulent representations of the defendant the transaction will not be void but only voidable, at his election. We have already shown that the complainant in this case, after full knowledge of the fraud, made his election to foreclose his vendor's lien, and in his bill of complaint he did not make any claim whatever that he was entitled to recover his interest in the property in addition to his lien, and if he had made such claim to have his title in the property re-invested in him he would not have been entitled to

such relief, as such recovery is inconsistent with his election to abide by and carry out the contract.

It is apparent from the authorities that we have cited that the complainant by his election to affirm and carry out his contract of sale of October 1, 1920, with Hoover and his assignees, cannot legally have any other relief prayed for by him in his bill that is inconsistent with such election. His bill of complaint, with all of the surplus and inconsistent allegations of fraud removed therefrom, is simply and only a bill to have the remainder of the purchase money due him under his contract of sale with Hoover declared and decreed by the court to be a lien against the Lafayette apartment building, also known in the record as the Riviera apartment building; that an account of the receipts from the income of said property by the defendants, or any of them, be taken and that they may be decreed to pay the same; that the interest of all defendants who furnished supplies or furnishings for the building be established with reference to the liens of the complainant for purchase money and for moneys advanced by him to pay unpaid bonds due and secured by the trust deed to the Chicago Title and Trust Company, to the end that all valid indebtedness created with respect to said matters may be paid, and for a receiver, for an accounting, for an injunction and for general relief.

On the filing of the bill an application was made for the appointment of a receiver and an injunction, which was referred to a master, who took the evidence and reported that the complainant was entitled to the injunction and to a receiver. An order was entered on October 6, 1921, appointing a receiver, which order provided that no receiver should be appointed if the defendant Oscar Rubin should, within seven days from the entry of the decree, file a bond in the penal sum of $50,000, conditioned to pay to the persons entitled thereto, upon the entry of a final decree, the entire revenues arising from the building during his pos-

session thereof, together with all damages or injuries to the building or losses in revenue through bad management, upon proper decree of the court, less only such amounts as might upon an accounting be shown by Rubin to have been properly paid by him during the time he had been or should remain in possession. Such bond was filed on October 10 with the Indemnity Insurance Company of North America as surety, and Rubin thereupon remained in possession until May 31, 1923, when the court entered an order appointing a receiver, who took possession of the building. The cause being at issue was referred to a master, who began taking the evidence on December 8, 1921, and filed his report in April, 1923. The cause was heard by the chancellor, and after its submission Larson died on November 13, 1923, leaving two daughters as his heirs, one of whom was a minor, and his widow, Anna Larson, who was appointed his administratrix, all of whom were substituted for Larson as defendants and cross-complainants, the minor daughter being represented by her mother as next friend and by a guardian *ad litem* appointed by the court, who defended for her. A decree was entered in the cause on July 9, 1924, setting aside the deeds of William S. Miller and wife and Larson and wife to Hoover, and also the contract of Hoover and others with I. Ellis Glaseman and Robert Guarno of February 11, 1921, and also the quit-claim deed of Hoover to Anna Pritikin, the trust deed of Anna Pritikin to David K. Cochrane, the warranty deed of Anna Pritikin to Rubin, the quit-claim deed of Larson and wife to Rubin, the trust deed of Rubin to the Chicago Title and Trust Company, also the general releases from Wollenberger & Co. and Wollenberger to Larson, Larson & Co. and the Larson Construction Company, and re-investing the title to the Lafayette apartment building in Miller, as trustee for Wollenberger and the personal representatives of Larson, subject to an accounting as to the rents and proper expenditures in the management and operation of the build-

ing as an apartment, as required by the decree. Rubin was decreed to execute a release deed of the premises to Miller to carry out the terms of the decree, and in default of his doing so Roswell B. Mason, master in chancery, was appointed a commissioner to execute such deed within ten days from the entry of the decree. Wollenberger was decreed a lien for $56,451.11, the balance of the purchase money due him on his contract of sale to Hoover, with five per cent interest thereon from December 9, 1920, subject only to the amount remaining unpaid by Hoover on the bonds and trust deed for $150,000. He was also decreed a lien for the sums paid by him for principal and interest on the bonds and for payments made by him for insurance, taxes and for other purposes authorized by the trust deed securing the bonds, with interest from payment at seven per cent per annum, less only moneys received by him, with proper adjustment as to the interest since October 1, 1920, to July 9, 1924, the amount of both liens being $112, 932.91. Harry B. Staver, as purchaser of Hoover's note for $8265 to Howard & Co., had recovered judgment on the note in the municipal court of Chicago, and had been permitted, upon his petition as an intervenor, to become a co-complainant in this suit with the complainant. He was decreed to have a lien of equal priority with Wollenberger's lien on the building for $8265, with five per cent interest from December 9, 1920. It was also decreed that the equity in the apartment building belonged one-half to the complainant and one-half to the representatives of Larson, subject to the amount unpaid by Hoover on the $150,-000 trust deed and to the payment of the amounts due the complainant and Staver, but the share of Larson or of his representatives was to be subject to an accounting between them and the complainant, and to the equity, if any exists upon an accounting between Larson and Rubin, and that there shall be surrendered to Rubin the note of $20,000 given by him to Larson and secured by second mortgage

on the Grenshaw apartment building. It was also decreed that the defendant and intervenor, Fred H. Fitch, had no valid claim against the apartment building and that he take nothing, and that the cross-bill of the Inland Security Company be dismissed for want of equity. It was further decreed that the defendants to the bill of complaint, A. D. Hawk, J. C. Doyle, the Bankers' Mortgage Company of Kansas City, I. Ellis Glaseman, Robert Guarno, David K. Cochrane, the Great Western Shade Company, Steven A. Coldren, Sol Rubin and William E. Murawska, have no interest in the subject matter of this suit. The cause was again referred to a master in chancery for taking an account of the rents and expenditures collected and made concerning the building and the taxation of costs. Rubin prayed for an appeal to the Supreme Court from this decree, but the prayer was denied on the ground that the decree was not final but was interlocutory.

On December 18, 1925, the master submitted his final report, dated October 20, 1925, and filed November 12, 1925, and on July 22, 1926, a final decree was entered by the court of the date of July 2, 1926, adjusting the accounts of all parties to that date with reference to the rents and expenditures made and collected for the Lafayette apartment building. The court held that Rubin was a fraudulent grantee and was liable for the reasonable rental value of the building during both periods of his possession; that the reasonable rental value of the building for the first period of his possession from April 6, 1921, to October 6, 1921, was $38,047.50; that for the second period of his possession, October 7, 1921, to May 31, 1923, the reasonable rental value of the premises was $125,777.78, or a total rental value for the entire time of his possession of $163,825.28, amounting to a total rental of $6341.62 a month. Counsel for Wollenberger conceded that Rubin was entitled to a credit of $9507.32 for expenditures for salaries, advertising, laundry, electricity, gas, telephone, coal, water, taxes and

sundries, (supplies,) as against the total rentals for the first period, and the court, by reason of that concession, allowed said credit, which left a balance due for the first period of $28,540.18, and because Rubin was a fraudulent grantee the court decreed that he should be charged with five per cent interest on the balance from October 6, 1921, to July 2, 1926, the date of the final decree, and found that the total sum due for the first period, with interest, from him to the complainant and the representatives of Larson was $35,-418.80. Counsel for the complainant conceded that Rubin was entitled to a total credit for expenditures for the second period of his possession of $41,636.61, and by reason of that concession the court allowed him a credit for that sum, and also allowed him a credit for the further sum of $13,-671.92, the amount paid by him as rents to the receiver on May 31, 1923, and held that he was liable for the remainder of $70,469.25, with five per cent interest thereon to the date of the final decree, amounting to the sum of $81,334.22. The court therefore entered a decree in favor of the complainant and the representatives of Larson, against Rubin, for $35,418.80 for the first period and for $81,334.22 for the second period of his possession, or a total decree of $116,753.02. The court further found that under the terms of the decree of July 9, 1924, an account was to be struck between the representatives of Larson and Rubin, arising out of the purchase by Rubin of Larson's interest in the Lafayette apartment building, which purchase was set aside and canceled by the decree. It was contended by the representatives of Larson that in such accounting Rubin was not entitled to any credits whatever as against them for any expenditures made by him in either the first or second period of his possession, for the reason that he was a fraudulent grantee in possession. It was also found by the court that in addition thereto Rubin had given his note for $20,000, and that Sol Rubin had delivered four notes to Larson in part consideration of said purchase, on

one of which there had been paid by Sol Rubin the sum of $874. All of said notes had been delivered by Larson and the solicitor for Anna Larson to the master in chancery, and it was ordered by the court that none of the notes should be delivered to Oscar Rubin or Sol Rubin until both the former decree and this decree had been complied with by Oscar Rubin. The court sustained the contention of the representatives that Oscar Rubin was entitled to no credit whatever as against such representatives, and found that Rubin owed them the sum of $4753.66 for rent for the first period of his possession, and five per cent interest thereon from October 6, 1921, to July 2, 1926, and the further sum of $20,818.30, with five per cent interest thereon from May 31, 1923, to July 2, 1926, for the second period of his possession, amounting to the total sum of $29,913.58, and entered a decree in favor of such representatives against Rubin for said sum in addition to the judgment against him in favor of the complainant and the representatives aforesaid, jointly. The court further found that Larson was in possession of the building from October 1, 1920, to April 6, 1921; that from October 1, 1920, to October 23, 1920, he was engaged in vacating the premises and furnishing the apartments; that from October 23, 1920, to February 28, 1921, he was in possession by his tenants, Glaseman and Guarno; that his possession was naturally divided into two periods, from October 23, 1920, to February 28, 1921, a period of four months and five days, in which he received $21,337.51, or more than $5000 per month; that for the period from February 28, 1921, the date on which he ousted his tenants, Glaseman and Guarno, to April 6, 1921, the date he delivered possession to Rubin, he received for rents $10,886.35, or almost $7000 per month. The master and the court allowed Larson credit for expenses connected with the first period of his possession amounting to $13,087.38, and for the second period of his possession the sum of $6148.93, or a total credit of $19,236.31, leaving a net lia-

bility of $12,987.55 to the complainant for both periods. The court gave judgment for said liability of $12,987.55 in favor of the complainant and against the representatives of the deceased, with five per cent interest thereon from April 6, 1921, to July 2, 1926, the date of the final decree, amounting to $16,391.37, and decreed that the judgment should be a lien on the one-half interest of the apartment building owned by Larson at the time of his death. The representatives, in stating their accounts before the master and the court, claimed that during the first period of his possession Larson or his agents had paid out additional amounts for the management and up-keep of the building to the amount of $5226.99, for which they were also entitled to credit against the claim of the complainant, but the court denied their claim on the ground that the proof was insufficient to establish the fact that any of said payments were made because there were no vouchers supporting the same. The complainant made the claim against the representatives of Larson that he had at his own risk and expense restored the title of the Lafayette building to Miller, the trustee holding the title at the time of the Larson fraud, and on that ground he further charged that they were personally liable to him for his solicitor's fees, amounting to $26,406, paid by him for the prosecution of this suit, and that in addition thereto they were further liable to him for $3051.02 for his expenses incident to the litigation, including the costs of the accountant's report on rents and for fees and expenses paid by him to his expert witnesses, Kagy, Croxton and Cline, amounting in all to $29,457.02. The master in chancery recommended that said sum be allowed, not against the representatives personally, but that the same should be paid out of the corpus of the property owned by the complainant and Larson at the time of the latter's death. The court held that there was no warrant for the allowance of said sum under the laws of this State or under the decree either against the corpus of the property

or against the representatives personally. The court also found that there was due to the complainant for purchase money $56,451.11, with five per cent interest thereon from December 9, 1920, to July 2, 1926, amounting to $72,155.49, and decreed him a lien for that amount. The court further found that the amount due Harry B. Staver was the sum of $8265, with five per cent interest thereon from December 9, 1920, to the date of the decree, amounting to $10,-564.27, and that he was entitled to a lien therefor against the apartment building of equal priority with the complainant's lien for purchase money. The court found that in the decree of July 9, 1924, the complainant was allowed the balance then due him for advancements made to preserve the property on account of maturities and interest and for taxes, and for other matters provided for under the trust deed for $150,000 given by Hoover to the Chicago Title and Trust Company, with seven per cent interest thereon to the date of the decree, and that since the entry of such decree the complainant has paid out the following amounts and has taken credit against such amounts paid by him, as shown by the following tables:

| Date | | Amount | Days. | Interest |
|---|---|---|---|---|
| 1924 | | | | |
| Nov. 1 bonds #41 to 60 incl. due | | 10,000.00 | 601 | 1,168.61 |
| Nov. 1 interest coupons #8 due | | 3,850.00 | 601 | 449.91 |
| 1925 | | | | |
| May 1 interest coupons #9 due | | 3,500.00 | 421 | 286.51 |
| Oct. 14 insurance (fire) Nat. Liberty Ins. Co. | | 2,560.00 | 258 | 12.84 |
| Nov. 1 bonds 60 to 80 incl. due | | 10,000.00 | 241 | 468.61 |
| Nov. 1 interest coupons #10 due | | 3,500.00 | 241 | 164.01 |
| 1926 | | | | |
| May 1 interest coupons #11 due | | 3,150.00 | 61 | 37.36 |
| | | $34,256.00 | | $2,587.85 |

Making a total disbursement to July 2, 1926, $36,843.85.".

Complainant has received of Lloyd J. Smith, receiver, by order of court the amount shown by the following table:

| Date | | | | | Amount | Days | Interest |
|---|---|---|---|---|---|---|---|
| 1924 | | | | | | | |
| Nov. 4 | ck. | Lloyd | J. | Smith | 7,000.00 | 598 | 813.95 |
| Nov. 18 | " | " | " | " | 1,000.00 | 584 | 113.55 |
| Dec. 8 | " | " | " | " | 1,000.00 | 564 | 109.67 |
| Jan. 2 | " | " | " | " | 1,000.00 | 540 | 105.00 |
| Jan. 20 | " | " | " | " | 1,000.00 | 522 | 101.50 |
| Feb. 17 | " | " | " | " | 1,000.00 | 495 | 96.25 |
| Mar. 3 | " | " | " | " | 1,000.00 | 479 | 93.13 |
| Mar. 26 | " | " | " | " | 850.00 | 456 | 75.37 |
| Oct. 1 | " | " | " | " | 3,500.00 | 271 | 184.43 |
| Oct. 23 | " | " | " | " | 256.00 | 249 | 12.39 |
| Nov. 13 | " | " | " | " | 2,500.00 | 229 | 111.32 |
| Dec. 31 | " | " | " | " | 2,500.00 | 182 | 88.47 |
| Feb. 8 | " | " | " | " | 2,500.00 | 144 | 70.00 |
| Mar. 20 | " | " | " | " | 2,500.00 | 102 | 49.58 |
| | | | | | $27,606.00 | | $2,024.61 |

Making a total of $29,630.61."

The court in approving the above report of complainant of bonds and coupons paid by him secured by the trust deed for $150,000, commented as follows: "This is allowing to the receiver from the date of each payment under order of court, the sum of $2024.61 for interest, which makes the excess of the disbursements of Herman Wollenberger over the receipts, after allowing interest on both sides of the account, $7213.24 since the entering of the decree. This makes the amount due the complainant for advances, with interest and all adjustments since the beginning of the action to the present date, computing interest on the decree of July 9, 1924, at five per cent per annum, $131,329.65." The court gave two judgments or decrees, amounting to the total sum of $131,329.65, to the complainant against Rubin, the first being for $59,174.16 for payments made by the complainant on the bonds and coupons prior to the decree of July 9, 1924, and since Novem-

ber 4, 1924, with interest as above indicated, and made the same a first lien on the Lafayette apartment building. The remainder of the total decree in favor of the complainant and against Rubin was for $72,155.49 for the balance due the complainant on the building for purchase money, which lien was decreed to be subject only to the amount unpaid by Hoover on the bonds and coupons secured by the trust deed. The court also gave Staver a decree for a lien for $10,564.27 on the building of equal priority with the lien of the complainant for purchase money. It was further ordered by the court that in default of payment of any of said liens within thirty days from the entry of the decree, on the direction of any of the lienholders the premises should be sold by a master in chancery of the court under the decree for the satisfaction of the liens in the order of their priority, subject to the balance remaining unpaid on the trust deed executed to the Chicago Title and Trust Company about October 1, 1920, which sum is found by the court to be $90,000, with interest on the unpaid bonds as provided by the trust deed. The court made this finding or statement in the record: "The reasonable rental value of the premises during these two periods, and each of them, was clearly established by competent evidence of witnesses familiar with the property, the rentals received for same property in the neighborhood and having full knowledge of the demand for housing accommodations covered by the period of possession of Oscar Rubin, which the court finds was a period of great scarcity and that the demand for housing accommodations was much greater than the supply; and the court further finds that the reasonable rental value per month of the premises during said two periods was substantially the same as the amount of rent received by Evans Larson per month during the period of his possession of the premises immediately preceding that of Oscar Rubin, and that the amount recommended by the master as above stated is correct." In another part of the opinion

the court stated: "It was shown that during the first period, [of Larson's possession,] starting with an empty building, to February 28, 1921, a period of four months and five days, he received $21,337.51, or more than $5000 per month, and for the period from February 28, 1921, to April 6, 1921, he received $10,886.35. The building, as shown by the evidence, in the later months was practically full and yielding a revenue of almost $7000 per month." On January 22, 1927, the court ordered executions for three of the lienholders against Rubin, one in favor of Wollenberger and Anna M. Larson, administratrix, for the sum of $116,753.02, another in favor of Anna M. Larson, administratrix, for $29,913.58, and the third in favor of Staver for the sum of $10,564.27. On February 1, 1927, the court, at the instance of the attorneys for the widow and heirs of Larson, entered an order for the delivery of the Lafayette apartment building, and the furniture and the household goods therein contained, to the complainant and the widow and heirs of Larson, to hold as tenants in common according to their rights as determined and decreed by the court on July 9, 1924, and by the decree of July 2, 1926, and further ordered that the receiver collect no further rents and have no further control or management of the building, and that Lloyd J. Smith, receiver, file his final report and final account as receiver within twenty days from the date of the order, and that he be allowed on account of his fees the sum of $2500, which amount he is authorized to retain.

Larson was in possession of the building from January 1, 1920, to April 6, 1921, the date he delivered possession to Rubin. From January 1 to January 23, 1920, he was engaged in vacating the apartments and preparing to rent them as furnished apartments, but during that period a small amount of rent was collected on the building, some of which was paid to the complainant. Larson rented the building to Glaseman and Guarno on January 23, 1920, and they continued in possession until about February 8, 1921,

at which time he forcibly ejected them and then took possession in person and remained in possession until April 6, 1921. The court was in error in stating that Glaseman and Guarno remained in possession until February 28, 1921. The court also erred in his conclusions that the building yielded as rent more than $5000 per month for the period in which Glaseman and Guarno were in possession as tenants of Larson, and that it was yielding a revenue of almost $7000 per month at the time Larson delivered possession to Rubin. The court failed to take into consideration the fact that Larson had collected advance rents for the months of April and May and a part of June, 1921, amounting to $3625. Larson admitted to Rubin that he had collected the advance rents and in his accounting with Rubin agreed to refund the amount of rents so collected by him, as will hereafter more fully appear. It is perhaps equally true that Glaseman at the end of his possession had collected advance rents, as he and Guarno, as well as Larson, were renting by the month and collecting monthly rents in advance from some of their tenants. Conceding that the total rent collected by Larson and his tenants was the sum of $21,337.51 and $10,886.35, as stated by the court, the actual sum collected by them for the periods of their possession is the sum of said two amounts, less $3625 advance rents collected, or $28,598.86. For the entire time Larson was in possession, October 1, 1920, to April 6, 1921, six months and five days, the net sum collected by him, $28,598.86, would only amount to $4637.65 per month. We call attention to these extravagant statements of rent collected by Larson not because they are material in any way to a correct decision of the real issues in this case, but simply to correct any false impressions that may have been entertained by the master in chancery and the court that Larson was collecting the enormous sum of "almost $7000 rent per month" at the time he sold and delivered the possession of the building to Rubin.

The writ of error to review the record was granted in February, 1927. Error has been assigned by Rubin on all of the judgments and decrees rendered against him by the court in favor of the complainant, the complainant and the Larson estate, and the Larson estate. The administratrix and heirs of Larson have assigned error on the parts of the decree which give Staver a lien for Hoover's $8265 note and find that the complainant is entitled to a judgment or decree for $16,391.37 for rents received over expenses incurred in connection with the building. The complainant has assigned error on the refusal of the court to order the Indemnity Insurance Company of North America to deposit in court $50,000, the amount of the bond given to enable Rubin to remain in possession of the building, and the denial of his motion to charge his solicitors' fees and expenses and expert witness fees as costs against Larson, amounting to $29,457.02. The Inland Security Company and Fred H. Fitch, who claimed to have an interest in the building by reason of their owning and holding certain of the Anna Pritikin notes secured by the trust deed executed by her for $90,000, have not assigned error on the decree against their claims. No other party against whom a decree or judgment has been rendered denying his or her right to an interest or claim against the building has assigned error.

Oscar Rubin's contention in this case is that he is the owner in fee simple, in good faith and for valuable con-. sideration paid by him, of the Lafayette building, subject to such sum as may be found to be due on the $150,000 bond issue and unpaid by Hoover and his grantees, and also subject to such sum, if any, as the court may find due in equity on the two Hoover notes, and to such sum as the court shall find due in equity on the $20,000 note to the administratrix and heirs of Larson. His claim as to the right of the complainant to recover his purchase money is that the complainant's claim for a vendor's lien against the premises is a secret lien, of which Rubin had no notice, and that there

should be no decree against him or the building for that lien. He has also through his attorneys, at various times during the hearing of this case, offered to pay to the complainant the amount of the purchase money to which he is entitled, if the court should find and decree that he is in equity entitled to recover the same, provided the court shall also decree that Rubin is the owner in fee of the complainant's half interest in the building on payment of the lien of the complainant and on his compliance with all other requirements of the contract of sale of October 1, 1920, and that as the complainant has elected to affirm the contract of sale and by his bill of complaint has so stated and limited his right of recovery to the balance due him for purchase money under his contract of sale and to the amount properly due him for bonds and coupons and taxes and other matters secured by the trust deed on an accounting, all questions of fraud of Rubin and others alleged in the bill are waived, and the consideration of such charges of fraud are not matters to be urged by the complainant or considered by the court in the decision of this cause as to the rights and interests of the complainant and Rubin in the subject matter of this suit. We have already substantially sustained the contentions of Rubin except his contention that the complainant is not entitled to a decree against him and the building for his lien for purchase money. We are entirely satisfied with that decision, and we do not deem it necessary to further discuss the correctness of it or the reasons for it. Under his bill of complaint his election to recover the balance of the purchase money unpaid to him is substantially a concession by the complainant that Rubin is the owner in fee of the undivided half interest in the building sold by the complainant to Hoover by the provisions of the bill of sale of October 1, 1920, subject to the right of the complainant to recover the amount due him for purchase money and to his other rights under the trust deed securing the $150,000 bond issue,

and he cannot be heard to contend otherwise. We therefore hold that the only remaining questions for decision as to the complainant and Rubin, for the reasons heretofore stated, are concerning the right of the complainant to recover from Rubin the amounts due him under his contract of sale and under the trust deed. The question of fraud, or how much fraud was committed or attempted to be committed by any party to this record, could not assist the lower court or this court in the adjudication of those questions.

Prior to October 1, 1920, the relations of Larson and the complainant with respect to the four buildings mentioned in the written contract, including the Lafayette building, was that of joint adventurers, as indicated by the allegations of the complainant's bill of complaint set out in the second paragraph of this decision and by the provisions of the written contract between Larson and the complainant of January 9, 1920, which was made a part of the bill of complaint. They were not partners, but their interest in the properties was simply an interest in the profits of the buildings after they were sold and all expenses were deducted from the sale of the buildings, including the money procured by the complainant of Wollenberger & Co. to defray expenses of building. It is one of the contentions of Rubin that the relation of Larson and the complainant with respect to the Lafayette building is still the same, and that the complainant's claim against him and Hoover is founded solely upon a right *in personam* for an interest in profits and not an interest in the property itself, and that for that reason the complainant had no interest or title to the building when he sold, or purported to sell, his half interest in it to Hoover, and therefore was not, and is not, entitled to a lien thereon for his purchase money. In that contention he and his attorneys overlook the fact that by the contract of Larson with the complainant, the contract of sale by the complainant to

Hoover and the contract of Larson with Hoover, all dated October 1, 1920, and by the deeds of Larson and wife and of Miller to Hoover in pursuance of said contracts, a new relation was created and recognized by Larson and the complainant with respect to the building. Larson recognized the complainant's right to sell an undivided half interest in fee simple in the building to Hoover, and the complainant at the instance and request of Larson did sell, or purported to sell, an undivided half interest in fee in the building, and in pursuance of the agreed plan the complainant executed his contract of sale to Hoover, and he and Larson then caused the complete title in fee to be vested in Hoover, subject to the lien of the trust deed to the Chicago Title and Trust Company securing the $150,000 bond issue, as heretofore stated. Neither Larson nor Hoover nor the legal heirs or legal representatives of Larson have at any time in this suit questioned the right of the complainant to make the contract of sale to Hoover. Larson and the complainant both recognized each other as the complete owners in fee of an undivided half interest in the building on the date the contracts and deeds were executed. In his bill of complaint the complainant elected to affirm his contract of sale and to ask a decree to him for the remainder due him for purchase money after full knowledge of all the alleged frauds charged in the bill. He is absolutely bound by his election, and Larson and his heirs and legal representatives are bound by his action in assisting in the completion of the new relation and contract of sale. The complete title was vested in Hoover, and that title passed by Hoover's deed to Miss Pritikin and by Miss Pritikin's deed to Oscar Rubin subject as aforesaid, and Rubin became obligated to pay the balance of the purchase money to the complainant, which was and is a lien on the undivided one-half interest in fee so sold to Hoover. By the contract of Larson with Hoover of October 1, 1920, which was thereafter recognized as valid by the complainant, Larson,

through Hoover as his agent and dummy, became the purchaser of the undivided half interest in fee of the complainant. Rubin is the grantee of Miss Pritikin and of Larson, and the full fee simple title was vested in him by all the parties that had or claimed any right or title in the property, and the obligations of Hoover and of Larson to comply with the provisions of the contract of sale to Hoover and to pay the complainant the balance due him for purchase money became the obligations of Rubin, as will further more fully appear in this decision.

Sol Rubin, brother of Oscar Rubin, and William E. Murawska, negotiated and closed the deal with Hoover in which Sol became the purchaser of the Lafayette building from Hoover. On March 8, 1921, Hoover executed a quit-claim deed to Anna Pritikin for an expressed consideration of ten dollars. Miss Pritikin was a girl who was employed in the Boston Store, in Chicago, and was of no considerable financial responsibility. She was a "stepsister—no blood relation"—to Sol's wife and took title to the building at Sol's request and for him, as he was at that time financially embarrassed and could not pay for and hold the property in his own name. On the same day she executed and delivered to David K. Cochrane, as trustee, a trust deed of the building for $90,000, purporting to secure the thirty-four promissory notes heretofore described in the complainant's bill of complaint. The actual consideration received by Hoover for that conveyance, except the indemnity agreement of March 9, 1921, was the ten $1000 notes of the thirty-four notes, and $500 in cash. Sol and Murawska, who was interested with Sol in the purchase, retained the other twenty-four notes signed by Miss Pritikin and secured by her trust deed to Cochrane. Miss Pritikin and Cochrane consented to act in their respective capacities at the request of Sol, and neither of them ever had or claimed any interest in the building and were guilty of no intentional fraud or conspiracy charged against them in the

bill. Sol and Murawska retained all the notes, except the ten above mentioned, for purposes of speculation and perhaps as "ammunition" to fight the complainant's claim against Hoover for purchase money, as suggested by master in chancery Mason, and to compel him to accept them, or some of them, as a second lien on the premises in lieu of his claim for purchase money. They deny the master's suggestion. At any rate, they had Hoover receipt Miss Pritikin for all of the thirty-four notes although he never received any of them except the ten notes above mentioned. It is not material to this decision to go further into the consideration of their motives in having executed all of the thirty-four notes when Hoover was only to receive ten of them. It is sufficient to say that the notes so retained by them, while in their possession, represented no actual value and were subject to the right of the complainant to recover the balance of the purchase money due him from Hoover and Larson. Of the $90,000 of the Pritikin notes $68,000 were held by Fitch, with whom they were deposited by Sol and Murawska on an option contract for the purchase of a building in Kansas City, but, as heretofore stated, he has made no complaint in this court of the decree denying him relief. Two of the ten notes delivered to Hoover were by him negotiated to S. S. Coldron, of Kansas City. Sol paid those two notes about January 4, 1922. The other $8000 of the notes delivered to Hoover were by him delivered as collateral security to the Inland Security Company for $14,000. Only one of those notes has been paid that company, but it makes no complaint in this court that the other $7000 of those notes were not paid. The $12,000 note of the Pritikin notes was in the hands of Sol and Murawska when this bill of complaint was filed, and so far as the record shows they still have possession and control of it, but if they should have negotiated it to some other holder such holder's right would be subject to the complainant's claim for purchase money due him and to the claim of

Staver under the doctrine of *lis pendens*. Sol obtained actual knowledge of the complainant's and Larson's interest in the Lafayette building before he purchased or secured the title of Hoover to it through Hoover's deed to Miss Pritikin, which was executed and recorded on the afternoon of March 8, 1921. Before the delivery of this deed to Miss Pritikin, Hoover signed a receipt to her in which he acknowledged that he had received from her all of the second mortgage notes and trust deed to the amount of $90,000. The receipt recited that "this transfer is made subject to a first mortgage of $145,000 and any claim that Evans Larson has against this property." Larson was then in the actual possession of that property. On March 7, and on the morning of March 8, 1921, and before the execution of the deed to Miss Pritikin, Sol examined the records of the recorder's office of Cook county and saw the two affidavits of Larson of December 4 and December 30, 1920, described in paragraph 7 of this opinion, and also an affidavit of Louis T. Orr of November 1, 1920, all of which were recorded, together with the copies of the contracts of Larson and Hoover and the contract of sale of the complainant and Hoover, which affidavits and contracts gave notice of Larson's, the complainant's and Howard & Co.'s interest in the premises, afterwards assigned to Staver. The record evidence warrants the conclusion that Sol read those affidavits on the records of the recorder's office, including the two contracts filed with them. On March 9, 1921, after the execution and recording of Miss Pritikin's deed from Hoover, and before the execution of the deed of March 10, 1921, of Miss Pritikin to Oscar Rubin, Sol and Murawska gave Hoover an agreement of indemnity, the first four lines of which were written by Murawska and the remainder thereof by Russel S. Clark, Sol's attorney. That agreement in full is as follows:

*"Ira J. Hoover, Chicago, Ill.*        "CHICAGO, *March 9th, 1921.*

"We hereby agree to procure your promissory note for the sum of not to exceed the sum of seventy-five thousand ($75,000) dollars upon which there is a balance due approximately fifty-eight thousand dollars ($58,000) including interest at the rate of seven per cent from December 1, 1920, given to Wollenberger or Wollenberger & Co., also to procure your promissory note for eighty-two hundred sixty-five dollars ($8265) with interest at 7% from March 1, 1921, and to return both notes to you canceled, and also agree to defend any suit at law at our expense which may be filed against you by said Wollenberger & Co., Herman Wollenberger, H. G. Howard & Co., or their assignees, to enforce payment.

"This indemnity is given to you in consideration of the delivery to Anna Pritikin of your quit-claim deed to premises known as northeast corner of Magnolia avenue and Lafayette street, Chicago, Ill., dated March 8, 1921.        WM. E. MURAWSKA,
                                                      SOL RUBIN."

Before and on the same day that Miss Pritikin's deed to Oscar Rubin was executed and recorded, March 10, 1921, Sol Rubin called his brother, Oscar, on the telephone and asked him if he would be interested in buying a piece of property on the North Side of Chicago. Oscar asked him if everything about the deal was all right, and after satisfying himself that Sol thought the deal was all right and a profitable purchase, Oscar replied that he would buy it provided it would not entail any personal care for the property on him; that if Sol would make the deal and look after the property in every way, he, Oscar, would buy the property. Sol replied that that was satisfactory to him and that Oscar would not have the looking-after the deal or the property when it was purchased and that all those matters concerning the property would be looked after by Sol. That was all that was said. Oscar had made several purchases of property before this deal in which he trusted Sol's judgment that the "buy was a good buy" and his promise to look carefully after the property. Oscar knew that it was up to him to arrange the financial part of the deal, but he did not even learn or ask from whom the prop-

erty was to be purchased. Oscar in the making of this deal for the building was affected not only with notice of Larson's possession of the property and his rights therein, but also by Sol's actual knowledge of the complainant's and Staver's rights therein, as Sol was his trusted agent in all matters concerning the property. He was also bound by Murawska's dealings with the property in so far as Murawska was dealing as Sol's agent. Oscar can legally avail himself of any defense to the complainant's claims that might have been made by Sol before he sold his interest in the building to Oscar. Neither Sol nor Murawska has any interest in the building. Their verbal agreement with Oscar after he agreed to become purchaser of the building was that on a re-sale of the property by Oscar each of them was to receive a one-fourth of the profits realized by Oscar, if any, after paying and discharging all his obligations to the complainant and all the obligations of Hoover under the $150,000 trust deed that had not been discharged at the time he deeded the property to Miss Pritikin, and Oscar was to receive one-half of such profits. So Sol's and Murawska's interests are mere rights *in personam*—mere interests in probable profits—which are not interests in the property.

Sol Rubin and Murawska by their agreement of indemnity agreed with Hoover to procure his promissory notes to the complainant and to Howard & Co. and to return both of the notes to him "canceled," and to defend any suit that might be instituted against him by Wollenberger & Co., Herman Wollenberger, Howard & Co., or their assignees, to enforce payment. That agreement was, in substance, an agreement to pay the notes to the legal holders thereof and to deliver them canceled to Hoover. The agreement was a very substantial part of the consideration to Hoover for his conveyance of the building to Miss Pritikin for Sol, and there can be no question that the entire consideration to Hoover was, within the meaning of the law,

a good and valuable consideration, amply sufficient to support the contract of sale, and that contract is binding on Sol, Murawska and Oscar Rubin, and also on the complainant by his election to ratify the contract of sale to Hoover. Oscar by his testimony in this case makes it clear that his agreement with Sol in their telephone conversation just before the deed of Miss Pritikin to Oscar was executed that he was to take over the property purchased by Sol from Hoover as the actual purchaser, and that he would pay therefor the consideration or price that Sol had obligated him to pay and discharge any obligation in addition to making cash payments that his brother obligated him to assume. Oscar states in his evidence that by his agreement with Sol the financial part of the obligation was up to him, and that his obligation in this deal was to pay any cash consideration that Sol should contract to pay and to also discharge any other obligation that Sol might obligate him to assume in the deal. He expressly stated that he did not know, or care at that time to know, the name of the party from whom Sol was making the purchase or how much Sol had agreed to pay for the property; that he adopted everything Sol had done in connection with the purchase of the property, and that it did not matter to him whether Sol was to get the property as a present or had agreed to pay $10,000 for it or $50,000 for it. There is nothing strange about the fact that Oscar trusted Sol to completely bind him to become the purchaser of the property and for whatever price or consideration that Sol might obligate him to pay or discharge. He trusted his brother absolutely, and so testified. He knew Sol was a real estate agent and thoroughly acquainted with the value of buildings, and particularly with the value of apartment buildings. Oscar was a very busy man, engaged in operating a department store, and he did not want to take upon himself the burden of looking after the deal or of caring for the property after the deal was made. He also makes it very plain that he intends to evade

no obligation with respect to that building that he has assumed by his verbal contract with Sol, and he expressly made it known to the circuit court that he would pay the amount due the complainant on the note to him and also pay any amount due the complainant for bonds and coupons and other matters paid by him and secured by the trust deed for $150,000, that were past due and not paid by Hoover or his grantees or by Larson and his tenants, if the court should determine that he is the owner of the complainant's interest so purchased by him and that the complainant is equitably entitled to recover the balance due him on the note. He has at no time questioned the right of Staver to recover on the other note named in the indemnity contract for $8265. Both of said notes were dated December 1, 1920, at the suggestion of the complainant, but as a matter of fact they were executed and delivered December 9, 1920. The first one of the notes was given for $73,803.29 and was made payable on demand, after date, to the order of "myself at Wollenberger & Co., Chicago, with interest at the rate of seven per cent per annum," and signed by Hoover. On the back of this note there were endorsed three credits or payments amounting to $17,352.18, two of the credits bearing the date of December 9, 1920, and the other the date of December 10, 1920. One of those credits was for the amount of the earnest money deposited by Hoover by check with the Chicago Title and Trust Company, less sixty-five cents for cashing the same, or $4999.35. The other two credits were for the profits realized by Hoover on the sale of the Carmen and the Clarke apartment buildings to Rieger, which were, respectively, $5000 and $7352.83, as heretofore indicated by the averments in the bill of complaint set forth in the fourth and fifth paragraphs of this opinion. The circuit court properly found that the amount due on that note on December 9, 1920, was the sum for which the note was given, less the sum of the three credits endorsed thereon, or $56,451.11, and that the

amount due the complainant was the remainder of the complainant's purchase money due on the Lafayette apartment building. The other note mentioned in the contract of indemnity was also signed by Hoover and was made payable to Howard & Co., real estate agents, in the sum of $8265, with seven per cent interest from March 1, 1921, and was after its date and before its maturity sold to Staver. Staver brought suit on the note against Hoover in the municipal court of Chicago and recovered judgment thereon against him on June 13, 1921, for $8396.89 and costs of suit. An execution was issued on that judgment by the clerk of that court on June 14, 1921, and on June 15, 1921, the officer in whose hands was placed the execution for service and collection made thereon and officially signed this return: "The within named defendant [Ira J. Hoover] not found and no property of the within named defendant found in the city of Chicago on which to levy this writ. I therefore return the same no property found and no part satisfied this June 15, 1921."

The proof in the record is amply sufficient to support the finding and decree of the court that the complainant was entitled to a decree for the remainder of the purchase money due him in the sum of $56,451.11, with five per cent interest thereon from December 9, 1920, the date on which the note was signed, to July 2, 1926, the date of the final decree, amounting to $72,155.49, and that he is entitled to a vendor's lien for said sum on the half interest of the Lafayette building sold by him to Hoover. The evidence also supports the finding of the court that Staver, who had been permitted, upon his petition as an intervenor, to become a co-complainant with Wollenberger in this suit, was entitled to a judgment or a decree on July 2, 1926, against Oscar Rubin on the judgment recovered in the municipal court of Chicago to the amount of $10,564.27, and that that judgment or decree is a lien against the whole of the Lafayette building. The vendor's lien of the complainant must neces-

sarily be limited to the half interest in the building sold by him to Hoover. The court did not, in addition to his vendor's lien, give the complainant a decree or judgment against Oscar Rubin on the indemnity contract for the amount due the complainant of $72,155.49. Therefore the complainant had no lien or judgment given him by the court that was a lien on the whole of the apartment building. The chancellor in the decree of July 2, 1926, erred in specifically holding, in substance, that the liens of Staver and the complainant should be of equal priority and against the whole of the apartment building, and that the amounts of the recovery of Staver and the complainant, by virtue of their liens against the building, should be in the same proportion as the amount of Staver's judgment or lien bore to the amount recovered by the complainant for his vendor's lien. The court would have been justified, under the evidence in this case, in rendering such decree if the complainant in his bill of complaint had set out the indemnity contract and had asked and had been given a final judgment against Rubin on that indemnity contract for the full amount due him for purchase money on July 2, 1926.

Louis T. Orr, a member of the real estate firm of Howard & Co., testified in substance that in the contract of sale to Hoover the complainant had agreed to pay the real estate firm a commission of $8265 "upon, and only upon, the full and complete consummation" of the contract of sale of the complainant to Hoover. He further testified, in substance, that about December 1, 1920, Hoover asked him to go with him to see the complainant, and that he consented to do so. When he and Hoover arrived at the complainant's place of business the complainant informed him that Hoover wanted to obtain an extension of three months to sell the Lafayette building and pay the purchase money due the complainant and the commission due to Howard & Co., and that if he could obtain such extension Hoover had agreed with him that he would give him a note for the

amount of commission due that company on the consumma-
tion of the contract of sale. Orr also testified that the com-
plainant asked him to accept the note of Hoover for his
firm's commission upon the terms indicated by Hoover. Orr
then stated to the complainant and Hoover that he was will-
ing to accept a note from Hoover on the terms proposed by
him, as what Hoover asked was a mere matter of the ex-
tension of time, but Orr further distinctly and plainly stated
to the complainant and Hoover that the giving of the note
was not to be considered as "in settlement or payment of
the amount due his firm at all," and that he made that
statement perfectly clear to them. The indemnity contract
to Hoover confirms Orr's testimony to the effect that the
second note therein named was given, as stated by him, to
get an extension of three months to Hoover to sell the La-
fayette building and pay the note, as the note bears date
December 1, 1920, and was made payable on March 1, 1921.
The complainant also testified that the note signed and de-
livered to him by Hoover on December 1, 1920, was not
accepted by him as payment of the amount therein named
and due him for purchase money, but was taken by him
merely as "an accommodation note for his own benefit, to
be held and re-delivered to Hoover upon payment thereof
or of his finding a purchaser who would do so." He also
made substantially the same statement in his bill of com-
plaint, as set forth in the fifth paragraph of this decision.
In view of the testimony of Orr and of the complainant
the court was justified in its conclusion that neither of the
notes was to be considered as the real obligation of Hoover,
and that the provisions of the note to the complainant that
it should bear interest at the rate of seven per cent from
December 1, 1920, and that the note to Howard & Co.
should draw interest at the rate of seven per cent from
March 1, 1921, should be disregarded. As neither the com-
plainant nor Staver has complained of the court's action the
decree of the court should be affirmed, unless Oscar Rubin,

against whom a decree or judgment was rendered on both of the notes, has suggested and urged some valid defense on his part. There is no such defense suggested or shown on behalf of Rubin.

Two other defenses have been suggested and offered by Rubin which this court held not tenable when this same writ of error was before us at a former hearing. There can be no doubt of the correctness of those holdings, and we now re-affirm and make those holdings a part of this decision in substantially the same language as was used in the former decision of this court, to-wit: One of the contentions of the plaintiff in error is that the complainant, Wollenberger, is estopped to assert his right of recovery on the note of Hoover by the statements of the circular letter in which Wollenberger offered for sale to the public the $150,000 issue of bonds secured by the trust deed to the Chicago Title and Trust Company, as trustee, on the Lafayette building, to the effect that those bonds were a first mortgage on the land, building and equipment and were the personal obligations of Hoover, president of the Bankers' Mortgage Company of Kansas City, a gentleman of high standing, reputed to be worth more than one-half million dollars; that the property was valued at not less than $300,000 and the net income was conservatively estimated at about $50,000, which was equivalent to nearly five times the maximum interest requirement and double the amount required for the payment of interest and $15,000 principal for any year, etc.; that the Chicago Title and Trust Company would issue its guaranty policy for $150,000 guaranteeing the bonds to be a first lien on the Lafayette apartment, ground and improvements, and, as trustee, also certify each bond. This circular was seen and read by Sol Rubin and was regarded by him as evidence of title in Hoover. This circular was issued to prospective purchasers of the bonds to induce them to buy bonds. Its statements were intended to be acted upon and produce

the purchase of bonds by those to whom it was sent. Neither Sol Rubin nor Oscar Rubin purchased any of the bonds, and no representations with reference to the bonds were made to them to influence their action in the purchase of the bonds or otherwise. They bought no bonds and had no right to rely upon the statements of the circular. Those statements were not made for the purpose or with the intent to influence the action of persons who might purchase the property on which the bonds were secured but the action of persons in the purchase of bonds, only. The doctrine of equitable estoppel or estoppel *in pais* cannot apply in this case, as it is essential to the existence of such doctrine that the person against whom it was invoked shall by his words or conduct have willfully made false representations of material facts for the purpose of inducing the party to whom they were made to act upon them and induced him to act upon them, and to have so altered his position that he would suffer loss if the party so inducing him to act should be permitted to repudiate his representations. While the authors and disseminators of false information designed to aid in the sale of bonds or of stocks may be held liable to all persons who are thereby induced to take the invited action, the law recognizes no right of action in one who relies, without invitation, on a statement addressed to a particular class of persons which he stays out of. *Cheney* v. *Dickinson,* 172 Fed. 109; *Wells* v. *Cook,* 16 Ohio St. 67; *Hunnewell* v. *Duxbury,* 154 Mass. 286.

The other contention relied on by plaintiff in error in his assignments of error and in his argument in this court is, that the circuit court should have dismissed the bill of complaint because Wollenberger & Co., the corporation, is an indispensable party to the bill if it will lie at all. On this question we heretofore held against plaintiff in error, and in rendering that decision, which we re-affirm, this court then used substantially the following language: The rule in equity in general requires that all persons having any

substantial legal or beneficial interest in the subject matter of litigation who will be materially affected by the decree must be made parties. The contract of October 1, 1920, for the sale and purchase of the property was between Wollenberger and Hoover, only. It is true that Wollenberger testified that Wollenberger & Co. owned the Hoover note and always owned it; that in the matter of the Lafayette building he acted for the company in everything he did and that it had no side issues in its business; that every deal he makes goes to the company and the stockholders get the benefit; that he did not own in his own right the Lafayette property but held it for the company; that he was trustee for the company and did not act for himself; that any business he does is for the company, but he does it in his own name. Nevertheless, the contract is Wollenberger's and not Wollenberger & Co.'s. Wollenberger is bound by it and Wollenberger & Co. is not. The basis of the suit is the contract of October 1, 1920, which fixes the relation and mutual rights of Wollenberger and Hoover in direct terms. The fact that Wollenberger was a stockholder in Wollenberger & Co. and the president of the corporation did not make his contract the contract of the corporation. A stockholder, though he owns ninety-nine per cent of the corporation, is not the corporation and is not the owner of the property of the corporation. The corporation is not bound by his contract as to the action of the corporation or as to its property. The contract of sale by Wollenberger to Hoover was Wollenberger's own contract. The property was not the property of Wollenberger & Co. but was the property of Wollenberger and Larson. Wollenberger, with Larson's consent, sold it to Hoover. Wollenberger was not merely a nominal party. Wollenberger & Co. had never owned the property and had not conveyed it to Wollenberger for any purpose. He was the joint owner of the property together with Larson and the conveyances to Hoover invested him with the title. It

was no concern of Hoover's whether Wollenberger was obliged to account to Wollenberger & Co. or not. He was not obliged to see to the application of the purchase money. His contract was with Wollenberger alone. Wollenberger & Co. had no lien upon the property, legal or equitable, and no interest which could be affected by this litigation. Wollenberger's testimony upon which the plaintiff in error relies is that he is a trustee for the company and does not act for himself; that whatever business he does is for the company but he does it in his own name. If he is to be regarded as a trustee the subject matter of the trust is the Lafayette building, and the object of this litigation is to recover for the trustee the unpaid portion of the purchase price of the building—that is, a portion of the trust fund. The litigation does not concern the rights of the trustee and the beneficiary of the trust, as between themselves, in any way, and the beneficiary is not a necessary party to such a suit to recover the trust property. *Carey* v. *Brown*, 92 U. S. 171; *Kerrison* v. *Stewart*, 93 id. 155.

The circuit court in its decree of July 9, 1924, sustained the cross-bill of Larson and set aside his deed of April 6, 1921, to Oscar Rubin. The material allegations of the cross-bill are in substance the following: Larson conveyed to Oscar Rubin his interest in the Lafayette building by quit-claim deed recorded April 6, 1921, and gave him possession thereof for the consideration of $15,000 in cash and a note for $20,000 signed by Anna Pritikin and secured by her trust deed on other premises known as the Grenshaw building. Sol represented to Larson that the building was subject only to an encumbrance of $40,000. The note was guaranteed by Oscar and Sol and was endorsed by Miss Pritikin. Sol further represented to Larson that a second trust deed on the Grenshaw property made by Miss Pritikin to Charles I. Norton, recorded January 20, 1920, to secure an indebtedness to him of $7350 payable to him, which stood of record unreleased, had been fully

paid although not released of record because he desired to protect Miss Pritikin's interest in the property. Subsequently Sol pledged the notes secured by the trust deed of Miss Pritikin to Norton to the Crawford Trust and Savings Bank as security for a loan of $11,000. Miss Pritikin at the time she executed the note for $20,000 was not the owner of the Grenshaw property. Nevertheless, Sol represented to Larson that she was then the owner of the building. She had previous to that time conveyed it to Sadie Rubin, wife of Sol. Larson accepted the $20,000 note relying on Sol's representations. The cross-bill further alleged that when Larson discovered this fraud he tendered back the $20,000 note; that the $15,000 cash paid by Oscar had been more than recouped by him from the rents of the building since his entry into the possession of it and that Larson owes him nothing, since Oscar has received from the income of the building more than Larson owed him; that Larson has rescinded his contract for the sale of the building to Oscar and offers to return the trust deed and note for $20,000 to him and demands a re-conveyance of the building and an accounting by Oscar of the rents received by him and all payments made by him on account of the building and the amount due from him over his proper disbursements on account of the building, and Larson offers to pay the amount due from him, if any, on a proper accounting.

This court in its former hearing of this writ of error found that Larson was not entitled to the relief prayed for in his cross-bill and reversed the decree of the circuit court sustaining it. Neither the heirs nor the legal representatives of Larson have urged any objections whatever against the decision, which is now re-affirmed and made a part of this decision in substantially the same language as this court used in its former decision, to-wit: A return of the consideration received by a party to a contract who elects to rescind is essential to the rescission. He must place the

other party in the same situation in which he was prior to the contract. A party to a contract cannot retain the consideration, or any part of it, and refuse to be bound by the contract or a part of it. His inability to restore the consideration will not relieve him from the necessity of so doing, and it is not sufficient to offer to set off the amount against what is claimed from the other party. (*Babcock* v. *Farwell,* 245 Ill. 14; *Dunbar* v. *American Telephone and Telegraph Co.* 224 id. 9; *Mortimer* v. *McMullen,* 202 id. 413; *Rigdon* v. *Walcott,* 141 id. 649; *Brady* v. *Cole,* 164 id. 116; *Wenegar* v. *Bollenbach,* 180 id. 222; *Hansen* v. *Gavin,* 280 id. 354; *Huiller* v. *Ryan,* 306 id. 88; *Farris* v. *Cavender,* 323 id. 227.) Moreover, the evidence did not justify the decree setting aside Larson's conveyance for fraud in procuring it. On April 2, 1921, Oscar and Sol Rubin and Larson entered into a contract reciting the conveyance to Oscar of the Lafayette building and its contents. It was therein agreed that Anna Pritikin had made a mortgage to secure $20,000 on the Grenshaw building and that the Rubins had guaranteed payment of the note; that the title to the Lafayette building had not been cleared, but it was agreed that it should be made perfect in Oscar and all parties would join in bringing that about. The Rubins agreed that within thirty days after the issuance by the Chicago Title and Trust Company of its guaranty policy to Oscar as owner of the Lafayette building, subject only to the trust deed of October 1, 1920, and the Pritikin trust deed of March 8, 1921, and to any defects in title caused by Oscar, the Rubins would cause to be paid to Russel S. Clark the $20,000 note; that such payment should be a complete discharge of the trust deed, and the trustee was authorized to release it when the money was paid to him and pay the money over to the holder of the note. The note and trust deed were dated April 1, 1921, and the note bore six per cent interest, was due two years after date, was signed and endorsed by Miss Pritikin, and was also

endorsed, "For value received we guarantee payment of the within note, principal and interest.—Oscar Rubin, Sol Rubin." Sol went into possession of the Lafayette building, and a disagreement arose between him and Larson concerning the collection by Larson of rents in advance which he had not accounted for to Sol, as well as other matters, and on August 1, 1921, an agreement was entered into which recited: On an account stated there has been found due and owing to Sol from Larson the sum of $3625. Larson is holding a junior mortgage for $20,000 on property located at the southwest corner of Grenshaw and Central Park avenues, the title to which is in Anna Pritikin, and there is unreleased of record against the property a second mortgage prior to the above described mortgage for $20,000, amounting to $7350. The parties hereto are desirous of making a complete and final adjustment of their respective matters excepting as provided for in the contract of April 2, 1921, between them. It was then agreed in the contract, following said recitals, that Sol should immediately place in the hands of Clark the trust deed, together with all notes and interest coupons representing the second mortgage of $7350, as yet unreleased of record, to be delivered to Larson or his assigns upon payment by Larson to Clark, for Sol, $3625 in cash, provided, however, that in the event the creditor's bill known as Midlinsky vs. Rubin, now pending in the circuit court, is determined at that time. In the event, however, that said creditor's bill is pending and undetermined when Larson pays $3625 in cash, then Clark, the trustee, is to retain the original trust deed and notes above described, but Sol agrees to provide Larson with a mortgage policy free and clear of the creditor's bill and prior junior mortgage above mentioned but at the expense of Larson. The evidence shows that Miss Pritikin had conveyed the premises to Sadie Rubin, the wife of Sol, on December 19, 1919, over fifteen months prior to the making of the $20,000 mortgage to Larson on the same property on

April 2, 1921. This deed, however, was not recorded until December 20, 1921, and Miss Pritikin held the title of record at the time she executed the trust deed. The recording of the trust deed of Miss Pritikin gave it priority over Sadie Rubin's title. It thus appears that whatever representation may have been made to Larson in regard to the title of the Grenshaw building or the priority of the $20,000 trust deed, and whatever may have been Larson's right to rescind the contract for the conveyance of the Lafayette building to Oscar, he waived that right by the contract of August 1, 1921, when he had full knowledge of the existence of the second mortgage on the Grenshaw building and was protected as a subsequent purchaser for value without notice of the Sadie Rubin deed. Knowing this situation he made a general settlement with Sol, by which he agreed he was indebted to Sol in the sum of $3625 and accepted his agreement to place in the hands of Clark the second mortgage of $7350, which was unreleased of record, to be delivered to Larson upon his payment to Clark, in cash, of the $3625 for Sol. Whatever right Larson might have had to rescind his transaction with Sol in regard to the conveyance of the Lafayette building in April was waived by this settlement of August 1. The decree was erroneous in setting aside Larson's deed to Oscar.

In the contract of April 2, 1921, signed by Oscar Rubin and Sol Rubin as parties of the first part and by Larson as party of the second part, it was first stated that Larson had on that day conveyed by his good and sufficient deed all his right, title and interest in the premises known as the Lafayette apartment building, and that by his general bill of sale he had conveyed to Oscar the contents of the building thereunto belonging, subject to an unpaid balance of $7000 on the chattel mortgage indebtedness to Rosenstiel for furniture and equipment and to a chattel mortgage for approximately $1905 to Mandel Bros. Larson covenanted and agreed on his part by the contract that

the incumbrance on the apartment building was on the date of the contract a trust deed dated October 1, 1920, on which there was an unpaid balance of $145,000 of principal; that there was due the Great Western Shade Company for material furnished on the building only the sum of $375, for which a lien was filed against the premises on March 17, 1921; that there was due on other preferred claims $443, as shown by "Exhibit I" attached and made part of the contract. Oscar and Sol, as part of the consideration for the conveyances, agreed to assume and cause to be paid in due course the items above specified, including those listed in "Exhibit I."

It was held by the lower court that in the accounting by Oscar Rubin for rents received by him for the Lafayette building he was not entitled to any credits for the chattel mortgages or for other chattel liens he had assumed and agreed in the contract with Larson to pay, because they were a part of the agreed purchase price to be paid by him for the furniture in the building. Rubin purchased the furniture therein subject to the chattel liens, which he agreed to pay. If Larson had paid the amount due on the chattels before he sold them to Rubin, in any accounting that he might have made thereafter to the complainant he would have been entitled to, and no doubt would have been given, credit in such accounting for the amount of such liens so paid by him. As purchaser from Larson, Rubin is for the same reason entitled to credit in his accounting for such liens discharged by him. The lower court in its order of October 6, 1921, authorized, and really ordered, him to pay such chattel liens. That order is contained in the proviso of the court's order appointing a receiver to take possession of the Lafayette building which enabled Rubin to retain possession of the building on condition that he obey the order of the court contained in that proviso, which is in this language: "Provided, however, that no receiver shall be appointed herein if the defendant Oscar Rubin, now in

possession, shall within seven days from the entry of this decree file a bond in the penal sum of fifty thousand dollars ($50,000) conditioned to pay to the persons entitled thereto, upon the entry of final decree herein, the entire revenues arising from said building during his possession thereof, together with all damages or injury to said building or loss in revenues through bad management, upon proper decree of this court, less only such amounts as may upon an accounting to be had in this court be shown by said Rubin to have been properly paid by him during the time he has been or shall remain in possession; that the revenues arising from said building shall be devoted to the maintenance and repairs when needed and the payment of prior liens and fixed charges thereon, and also the balance due for furnishing the same, when authorized by the court. It shall be a condition of said bond of Oscar Rubin that such revenues shall be so applied during his possession from this date."

The condition of the bond of Oscar Rubin followed the requirements of said order of court exactly as the conditions of the bond given will show and which are in this language: "The condition of the above obligation is such that whereas, by an order of the circuit court of Cook county sitting in chancery, made on the 6th day of October, A. D. 1921, in a cause therein pending wherein Herman Wollenberger is complainant and Oscar Rubin et al. are defendants, it was among other things ordered that no receiver be appointed therein if said defendant Oscar Rubin shall within seven days from the date of the entry of said order file his bond in the penal sum of fifty thousand dollars ($50,000) conditioned to pay to the persons entitled thereto upon entry of final decree therein, the entire revenues arising from said building during his possession thereof, together with all damages or injury to said building or loss in revenues through bad management, upon proper decree of said court, less only such amounts as may, upon

an accounting to be had in said court, be shown by said Rubin to have been properly paid by him during the time he has been or shall remain in possession, and that such revenues of said building shall be applied by said Rubin during his possession from the date of said order to the maintenance, repairs when needed, and the payment of prior liens and fixed charges thereon and also the balance due for furnishing the same. Now, therefore, if the above bounden Oscar Rubin shall well and truly pay to the persons entitled thereto upon the entry of final decree in said cause, the entire revenues arising from said building during his possession thereof, together with all damages or injury to said building or loss in revenues through bad management, upon proper decree of said court, less only such amounts as may upon an accounting to be had in said court be shown by said Rubin to have been properly paid by him during the time he has been or shall remain in possession, and that such revenues of said building have been applied by said Rubin during his possession from the date of said order to the maintenance, repairs when needed, the payment of prior liens and fixed charges thereon and the balance due for furnishing the same, then the above obligations to be void and otherwise to remain in full force and effect."

The bond was ordered given by the court pursuant to the provisions of our statute on applications for the appointment of receivers, which was applicable in this case and provides as follows: "On application for the appointment of a receiver the court or judge may, in lieu of appointing a receiver, permit the party in possession to retain such possession upon giving bond, with such penalty and with such security and upon such condition as the court or judge may order and approve."

The statute gave the court the right and power to determine fully the conditions upon which Oscar Rubin, the party then in possession, could retain his possession. The court did fix very definitely those conditions, and in its

provisional order it was further provided that those conditions should be the conditions of the bond to be given by him. They were expressly made the conditions of the bond, which was duly filed and approved by the court. That bond, when filed and approved by the court, fixed exactly the obligations and liability of Rubin with respect to the rentals. The liability of Rubin on that bond was "to pay to the persons entitled thereto, upon the entry of final decree herein, the entire revenues arising from said building during his possession thereof, * * * less only such amounts as may, upon an accounting to be had in this court, be shown by said Rubin to have been properly paid by him during the time he has been or shall remain in possession." The provisional order, and also the bond, further provide "that the revenues arising from said building shall be devoted to the maintenance and repairs when needed and the payment of prior liens and fixed charges thereon, and also the balance due for furnishing the same," and "shall be so applied during his possession from this date." The court had no authority whatever to deny Rubin credit for the chattel liens so paid by him after it had by its decretal order authorized the payment of the liens and had approved his bond requiring him to pay the same. Larson had, at the time he took possession of the building, determined that it was most profitable to all concerned to furnish the apartments of the building and to rent them furnished. The complainant approved that conclusion, and no one interested in the building or in its rentals objected to Larson's determination to so furnish and rent the building. The decretal order of the court also determines and settles another question in this case: that the bond only covers the obligations of Rubin for the rentals during the second period of his possession, as both the provisional order of the court and the bond provide that "such revenues shall be so applied during his possession from this date," that is, from the date of the decretal order.

Oscar Rubin became the owner of the building by virtue of the deed from Hoover to Anna Pritikin and the deeds of Miss Pritikin and Larson to him, subject to all the obligations of the trust deed securing the unpaid bonds and coupons and subject to all other claims against him before indicated. As owner of the building he is defined as the mortgagor in the trust deed and takes the place and the obligations of Hoover, the original mortgagor under that trust deed. One of the questions for decision in this case is as to his liability for rents under the first period of his possession. Counsel for the Indemnity Insurance Company of North America, the surety of Rubin on his bond, have suggested and argued that the amount of rents that he should be required to pay during the first period of his possession is the amount that he might have collected from the building by the exercise of reasonable care and prudence. In the case of *VanBuskirk* v. *VanBuskirk*, 148 Ill. 9, it was held by this court that constructive trustees in possession were held to be liable to pay such rents as might have been received from the property by the exercise of reasonable care and prudence. Rubin was not a constructive trustee in the possession of the Lafayette building during the first period of his possession but was the mortgagor in possession under the definitions of the trust deed, subject to which he took title. The duty, therefore, of collecting rents and profits to discharge the obligations for which they were mortgaged rested upon him, and some measure of diligence and prudence ought equitably to be required of him to collect a sufficient amount of rents to meet the obligations for which they were mortgaged. The rents and profits were not to be paid to the complainant and retained by him in his own right. Every right of the complainant to collect his purchase money was subject to the rights of the bondholders and others whose interest or claims were secured by the trust deed. However, the complainant was named in the trust deed as the party who

should collect the rents and profits mortgaged as aforesaid, but solely for the benefit of the holders of bonds and coupons and other lienholders secured by that trust deed. We hold that it was the duty of Rubin to pay to the complainant, for the use of the lienholders under the trust deed, such rents and profits as he could have collected by the exercise of reasonable care and prudence. The enforcement of the rule of absolute liability for the reasonable rental value of the premises would most probably impose upon Rubin a duty which he could not perform, as suggested by counsel. The rule that we adopt cannot result in any such hardship. It is a rule that will simply require upon Rubin's part the performance of a duty he assumed. Moreover, the reasonable rental value of the premises as found and approved by the court in its decree was not proved by competent witnesses who were acquainted with the Lafayette building and its ninety-six apartments. The evidence upon which the court's decree is based was given by an expert accountant of Touche, Niven & Co. The accountant examined Rubin's account of the rents received by him and prepared and put in evidence a table showing how much the apartment building would have rented for if all the apartments had been rented at what he termed "normal rent" during the whole time Rubin was in possession. To determine the normal rent the accountant took from Rubin's account what appeared to him to be the normal rents of all the apartments. The accounts of Rubin showed that the actual rentals received by him for the several apartments varied to the extent of five, ten and fifteen dollars per month. The following testimony of the accountant shows its worthless character as evidence in this case: "If part of that period shows the payment of $50 a month and we consider $60 the normal rent, why, we figure up the rent as $60 all the time. If there were different amounts of rent shown to be received during a given period I would take what was most likely the normal rent, and I would

count the rent as normal during that period no matter what was received. I never saw the building, know nothing about the construction. * * * I made no effort to find out whether it was fully rented or not. My figures are based on the proposition that the building was rented all the time. My own personal knowledge of the rental situation in the city of Chicago shows that at that time it was hard to rent property. I did not know the condition of the building at that time or at any other time." Other expert witnesses on the values of real estate in Chicago, including apartment buildings in the locality of the Lafayette building, testified that in their judgment the "normal rental value" per month of the apartments in that building shown in said accountant's report was the reasonable rental value of such apartments. They further testified that at the time Rubin was in possession ninety-five per cent of all the apartments in the building should have been rented and occupied by tenants. They did not know the number of rooms or the size of the rooms in any apartment described in the accountant's report. It was further proved that some of the apartments contained one, some two and others three rooms. It was stated by one or more of the witnesses that the number and size of the rooms in the apartments would materially affect the value of such apartments.

The evidence in the record shows clearly that Rubin kept the premises well advertised during the whole of the time he was in possession, and kept in charge of the building, as manager, E. F. D. Hoffman, who also had charge of the building for the receiver appointed by the court. The same housekeeper was under both Rubin and the receiver. Hoffman and the housekeeper testified that they used their best efforts to rent apartments to all respectable applicants. Oscar Rubin and others testified that the building had a bad reputation when he first took possession, but the evidence further shows that the building got its bad reputation during Larson's possession of it and that it was raided by the

police one or more times before Rubin got possession. It was further shown that men and women of immoral character were not allowed to remain in the building as tenants when their characters were ascertained under his management, and that by reason of his care in the management of the building it gradually regained its good reputation, and that the rentals of the building continually increased from the time he took possession until he was succeeded by the receiver appointed by the court, who took possession June 1, 1923. There is no evidence in the record of any damages to the building or loss in revenues through bad management under Rubin. During the first six months of Rubin's occupancy the revenues of the building amounted to only $12,384.50, or $2064.08 per month. By adding to the six months' total the $3625 that Larson collected as advance rents for April, May and June, 1921, the actual rents collected for the six months of Rubin's possession was $16,-009.60, or $2668.27 per month. The total rents collected by Rubin for the twelve months of 1922 was $45,838.89, or $3819.90 per month. The total rents collected by him for the last five months of his possession, from January 1, 1923, to May 31, 1923, was $21,098.44, or $4219.68 per month. Lloyd J. Smith, the receiver appointed by the court, took possession of the building June 1, 1923. During the first seven months of his possession ending December 31, 1923, he collected $27,258.56, or an average of $3882.32 per month. In the first five months of 1924 he collected $21,966.89, or $4393.38 per month. The total collected by the receiver for the first year of his possession ending May 31, 1924, was $49,225.43. The total rents collected by Rubin for the last year he was in possession were $49,983.99, or $4165.33 per month. The fact that Rubin collected more rents during the last twelve months of his possession than were collected by the receiver is a very significant showing in Rubin's favor. He ought not to be penalized because the rentals collected by him for the

first six months of his possession were much less than they were in 1922 and in the last five months of his possession in 1923. The evidence clearly shows that the bad reputation of the building when he came into possession of it very materially handicapped him in renting the apartments to respectable and desirable tenants. The fact that Larson rented to undesirable "one night" occupants also explains very satisfactorily why he collected more rents per month than Rubin or the receiver. It is also further explained by the fact that he collected advance rents. We hold that the evidence shows that Rubin collected all the rent from that building that he could collect by the exercise of reasonable care and prudence, not only during the first period of his possession but during the entire time he was in possession of it.

Oscar Rubin was proven to be a business man of good standing, whose net worth was $300,000 or more. No witness who testified has undertaken to give evidence tending to show that those facts are untrue. The averments in the bill of complaint that he is "a man of very little resources," and that he, with Larson and others, conspired to defraud the complainant in the collection of the balance due him for purchase money are not true. We desire to emphasize the fact that Rubin is the *bona fide* owner of the title to the building for a good and valuable consideration paid and to be paid, and is to be denied no credit for rents paid to the receiver or for any liens discharged by him on the ground that he is a fraudulent grantee or that he has not furnished vouchers for any items of credit that he has presented. He should be required to furnish proof that the items of credit he has presented were paid by him and that they are proper charges against the rents collected by him. On remandment of this cause he should be permitted to furnish further proof that items of credit denied him are proper items of credit, if such proof should be required to establish his right to such credits.

We refrain from passing on any objections raised to items of credit asked by plaintiff in error against the rents collected and reported by him except as to the fees of Russel S. Clark, his attorney. He was clearly not entitled to credit for those fees or any part of them, and the objection to the allowance thereof was well taken and was properly sustained by the chancellor. We desire to further indicate that on the question of the allowance to Sol Rubin and William E. Murawska the fees claimed by them for services as managers of the building for plaintiff in error, the allowance or disallowance to them should be determined solely on the question as to the proper amount that should be allowed, and that amount should be ascertained with reference to the amount charged by the receiver and allowed and ordered paid by the chancellor. Oscar Rubin was entitled to the services of one manager and one only, and that manager should only be allowed the same or an equal amount per week or per month as was allowed and paid to the receiver by order of the chancellor. Rubin had employed Hoffman and the same housekeeper that were employed later by the receiver, and the receiver was the manager and the only one that was paid as such. The expenses of the management should be no greater under Rubin's possession than under the receiver's possession. If two managers served all the time or any of the time under Rubin they should both receive only the pay per week or month that the receiver received for his services. The lower court can fix the amount. We are not advised by the record what the receiver's fees were.

Oscar Rubin stated during the hearing in this case, as we understand him, that if Larson, as he agreed to do in his contract of April 2, 1921, would cause the Chicago Title and Trust Company to issue to him its usual and customary guaranty policy and clear or have cleared the title to the Lafayette building, subject only to the trust company's formal objections and to the trust deed for

$150,000 and the trust deed of March 8, 1921, given by Miss Pritikin, and also subject to any defects of title caused by Rubin and his grantees, he would within twenty-four hours thereafter pay to Larson's administratrix the $20,000 note secured by the trust deed of Miss Pritikin on the Grenshaw building, if the administratrix would first pay to him the $3625 for advance rents collected by Larson and which Larson agreed to pay Rubin by his contract of August 1, 1921. We suggest that if Rubin is still willing to abide by his statement in court, the quickest and perhaps most satisfactory way for Rubin and the administratrix to adjust their matters is that they agree that the $20,000 note be credited with the $3625 that Larson agreed to pay Rubin, and that then Rubin pay the remainder due on the note, less said credit. This ought to be satisfactory to the administratrix, as it would relieve her of the expense of paying for a guaranty policy on the Grenshaw building guaranteeing her against the second trust deed on that building for $7350 in favor of Norton. We merely, however, offer this solution as our suggestion. We do not see how it would in any way prejudice Rubin to adopt this proposed plan of settlement. We will simply say further that if Rubin collects the $3625 in the way suggested, or if he collects the $3625 in cash, he will be held to pay it as rents collected by him to the complainant, for the reason that it will clearly be rents collected by him for the first period of his possession. We further hold that if the administratrix pays to Rubin said sum by either of the above methods she should be freed of all further obligations to pay rents to the complainant for the benefit of the lienholders under the $150,000 trust deed. We arrive at this conclusion on the facts in the record showing clearly that Larson and his administratrix did not owe the complainant, for the use of the lienholders under the trust deed, as much as $3625 under any theory of the evidence. Therefore the lienholders would

not be injured but would be really benefited by the above suggested adjustment between Rubin and the administratrix.

There is no theory under the pleadings and the evidence in this record on which the judgment or decree of the lower court in favor of the complainant and against the administratrix of Larson for the sum of $16,391.37 may be sustained. We have already definitely settled this question by holding that the bill of complaint, stripped of all surplus and inconsistent allegations of fraud, is simply and only a bill by the complainant to have declared his vendor's lien and to recover the remainder due him for purchase money and the amounts properly and legally due him for past due bonds owned by him in his own right, and for other obligations of Hoover under the trust deed securing the $150,-000 bond issue discharged by the complainant and for which he has not been re-paid. The complainant had sold all his interest in the building to Hoover for Larson, and had elected, when he filed his bill of complaint, to carry out the provisions of his contract of sale after full knowledge of all the facts necessary to bind him by such election. The complainant after such election owned no other interest whatever in that apartment building except as above stated. Another reason for declaring that the complainant cannot in his own right recover the judgment against the administratrix of Larson for rents, issues and profits of the building, is the fact that by the first two paragraphs of the provisions of the trust deed securing the payment of the $150,000 bond issue, the entire building, and "all rents, issues and profits thereof which are specifically conveyed and assigned to said trustee and to its successors in trust," are mortgaged "to secure the payment of the principal and interest of all the bonds aforesaid at any time outstanding, according to their tenor and effect, irrespective of their time of issue, and the performance of each and all the covenants and conditions in said trust deed contained  *  *  *  and for the benefit and security of any and all persons that shall

make disbursements and incur costs and expenses under the provisions of said trust deed, and for the other uses and purposes declared in said instrument." For like reasons the judgment or decree in favor of the complainant and the legal representatives of Larson for $116,753.02 must be and is reversed and set aside. Neither the complainant nor Larson or his legal representatives at any time had any right whatever to recover rents, issues and profits so mortgaged against any tenant of that building, except for the purpose of having them applied in the discharge of the bonds and other obligations of the mortgagor under the trust deed. Larson, as we have already held, had conveyed all his interest in that building to Oscar Rubin by a good and sufficient deed and for a good and valuable consideration and owned no legal title to the building at the time he filed his cross-bill against Rubin. The complainant, under the provisions of the trust deed, was authorized to collect rents, issues and profits and to receive the monthly advancements provided for under the trust deed to pay the interest on the bonds and to pay the bonds coming due at the end of each year, but he at no time had the right to apply the same to any purpose other than the discharge of some legal obligation of the mortgagor under the trust deed.

The contention of the complainant that the chancellor erred in denying his petition and motion to order the Inland Insurance Company of North America to deposit in court $50,000, the full amount of the bond given to enable Oscar Rubin to retain possession of the building, cannot be sustained. The theory upon which the court was asked to grant such motion and order was that Rubin, after allowing to him every credit or set-off he claimed against the judgment against him for the complainant, was unquestionably liable for several thousand dollars more than the full amount of the bond, and that the insurance company was also unquestionably liable to him for the full amount of the bond as surety for Rubin. The only decree or judg-

ment in favor of the complainant against Rubin in this record that can or will be sustained by this decision is his decree for purchase money, which liability of Rubin the bond does not cover. Inasmuch as the complainant was not entitled to recover any judgment whatever against Rubin in his own right he cannot be heard to complain of the order of the court denying his petition and motion and in dismissing his petition, and the order of the court is sustained.

The court also very properly denied the motion of the complainant to charge his solicitors' fees and expert witness fees of Touche, Niven & Co., accountants, and other expert witness fees, amounting to $29,457.02, as costs against Larson. We have discussed the worthless character of the testimony of said witnesses and in substance have held the same inadmissible. We have analyzed the bill of complaint and have shown fully that it is simply a bill of complaint filed for the purpose, only, of obtaining relief for the complainant. It is not a bill, in any sense, to obtain any relief for Larson. In fact, it is alleged in the bill that Larson conspired with Hoover, Rubin and others to defraud the complainant. It is inconceivable that there could be any obligation whatever on Larson's part to pay the complainant his solicitors' fees. We therefore decline to discuss the matter further, and we affirm the order and judgment of the court denying said motion. The said witness fees and other expenses are not proper costs recoverable by the complainant in this case or by the witnesses.

It is the well settled law in this State that where one person for a valuable consideration makes a promise to another for the benefit of a third person, such third person may maintain an action upon it. It is not necessary that there should be any consideration moving from the third person for whose benefit the promise is made or that there should be any privity between them. We cite the following decisions of this court which amply support the fore-

going propositions: *Beasley* v. *Webster,* 64 Ill. 458; *Snell* v. *Ives,* 85 id. 279; *Webster* v. *Fleming,* 178 id. 140; *Bay* v. *Williams,* 112 id. 91; *Dean* v. *Walker,* 107 id. 540; *Siegel* v. *Borland,* 191 id. 107; *Ray* v. *Lobdell,* 213 id. 389.

The indemnity contract signed by William E. Murawska and Sol Rubin is in writing, and we have already held that Oscar Rubin is bound by that contract. We have heretofore indicated that if the complainant in this case should desire to amend his bill of complaint as suggested, he could remove the inconvenience of his having a lien on only an undivided half interest in said building while Staver has a lien on the whole of the building. If the bill is so amended and the chancellor should grant a decree or judgment in favor of the complainant on the indemnity agreement and against Rubin for the amount due the complainant for purchase money the recitals now in the decree would be true and consistent with the actual facts.

Under the provisions of the contract of sale between the complainant and Hoover the complainant agreed to pay H. G. Howard & Co. a commission of $8265, to which we have already referred. The commission was to be paid by the complainant "upon, and only upon, the full and complete consummation" of that contract of sale. The complainant, although he elected to carry out the contract of sale, evaded his liability to pay that commission and had Hoover give Howard & Co. his note for that sum, which note was later assigned to Staver, who now has a judgment or decree against Oscar Rubin, as heretofore stated. This failure of the complainant to pay that claim to Howard & Co. was a deliberate act of fraud against Larson, as the decree or judgment of Staver was rendered against the Lafayette building, which was the property of Larson. The only excuse offered by the complainant for this unjust act of his is that by his contract of sale he did not become liable for the commission as the contract of sale was not carried out. That is the very reason why he should not

have had Hoover give Howard & Co. a note for that commission. The complainant well knew that he was not then liable to pay that commission, but he realized that he would be liable for it if he carried out the contract of sale by electing to collect his purchase money in case the owner of the title or the mortgagor discharged all his obligations to the complainant under the bill of sale and paid him the balance of the purchase money due him. In view of the plain indications in this record that the complainant is disposed to ignore his obligations under the contract of sale, we deem it proper to state his other obligations under that contract in case Oscar Rubin shall comply with his obligation and pay to the complainant the full amount due him for purchase money. Under that contract of sale he is obligated to furnish Rubin a guaranty policy or policies issued by the Chicago Title and Trust Company and is to be ready to deliver the same to Rubin upon his payment to the complainant of the purchase money due. Those provisions mean that the complainant is to furnish such guaranty policy at his own cost. The contract also obligates him to make and deliver a deed or deeds of the premises to Rubin. The meaning of the contract is that the complainant is to pay for the making of the deed but not for the recording of it. The taxes on the building for the year 1920 are to be "prorated from January 1, 1920, to October 1, 1920." We interpret this provision to mean that the complainant was to pay three-fourths of those taxes and Rubin one-fourth. Rubin, while he was under bond, paid all of these taxes. The complainant has paid none of them. All expenses in connection with the bond issue of $150,000 on the Lafayette building and the new trust deeds given to the complainant for $10,000 and $15,000 on the Clarke and the Carmen buildings, respectively, are by the provisions of the contract of sale to be borne by the complainant. The record evidence shows that the complainant was allowed as part of the consideration of the sale ten per cent of the face value of

all three of said mortgages. He was also allowed as part of the consideration three per cent commission on the old mortgage of $60,000 that was on the Lafayette building at the time the $150,000 mortgage was given on that building by Hoover, because it required three per cent on $60,000 (the amount the old mortgage was given for) to cash it with the proceeds of the $150,000 mortgage, as the $60,000 mortgage was not due at the time of the sale. In the sale to Hoover he realized a net profit of $189,575. His profit on the Lafayette building was $150,000, less $61,800 required to pay off the old mortgage on that building, or $88,200. There were two mortgages on the other two of the buildings, of $19,000 and $22,000. The two new mortgages of $10,000 and $15,000 placed on the Clarke and the Carmen buildings, respectively, represented net profits to the complainant on those buildings, which were later sold subject to all four of the mortgages. The earnest money of $5000 and the cash payment of $71,375 were clear profit to the complainant. In the face of these facts the complainant testified that the reason he sold his interest in those three buildings to Hoover at cost to him was to "get away from the gang." By "the gang" he meant Larson, Sol Rubin, Murawska and Hoover. Larson testified that the complainant told him that he thought Larson had been "trimming him," and that he was going "to trim" Larson. The complainant did not deny making that statement. Under the contract of January 9, 1920, between Larson and the complainant, Larson was granted the exclusive right until January 1, 1921, to sell all three of said buildings and the Magnolia building at minimum prices fixed by that contract for those buildings. Larson further charged that the complainant was continually harassing him with lawsuits, and was not satisfied with the fact that Larson refused to sell the Magnolia building for $45,000 to a party named by the complainant and who was a close friend of the complainant. The minimum price fixed for the sale of the

Magnolia building was $50,000. In the summer of 1920 Larson sold that building for a price more than $14,000 greater than the minimum price of $50,000. Instead of being contented with Larson's efforts in selling that building, the complainant, according to Larson's evidence, expressed his very great displeasure because Larson did not sell this building to the complainant's friend for $45,000.

The proof in the record shows beyond a reasonable doubt that the complainant received four advance payments of $2125 in November and December of 1920, in January of 1921 and on March 1, 1921, for advance payments for the first $15,000 of the bonds secured by the trust deed for $150,000 and the annual interest on the $150,000 of bonds represented by coupons maturing May 1 and November 1, 1921. Every one of the advance payments so made were one-twelfth of the first $15,000 of bonds maturing on November 1, 1921, amounting to $1250, and the four advancements of principal amounted to $5000. Every one of the advance payments of interest so made were one-twelfth of the annual interest on the $150,000 of bonds, or one-twelfth of $10,500, or $875, and the four advance payments of interest amounted to $3500. The complainant in his evidence in the record positively testifies that only two advance payments of $2125 were made, one by Glaseman and Guarno, tenants of Larson from October 23, 1920, to February 8, 1921, on which latter date they were forcibly ousted from the possession of the Lafayette building by Larson. Marcus A. Cavanagh, attorney for Larson, paid to the complainant, for Larson, the advance payment of $2125 that was paid March 1, 1921, for the month of February, 1921. There is no dispute as to the payment made by Glaseman and Guarno and by Cavanagh for Larson. The complainant credited Hoover for both payments, as he was the purchaser who had obligated himself both by the bill of sale to him by the complainant and by the trust deed securing the $150,000 of bonds to make such payments to

the complainant for the benefit of the holders of the bonds. Cavanagh testified in substance that at the time he made the payment of $2125 for Larson, who was the real owner at that time of the complète title to the building, the complainant told him that the payment Cavanagh made on March 1, 1921, was the fourth payment of $2125, and that three other payments of like amount had been made to him, one for November and one for December, 1920, and one for January, 1921. He also testified that he was interested in ascertaining how many such payments were made, and that as a result of that conference with complainant he got the information that by those four payments $5000 of advancements had been made to him on the $15,000 of bonds due November 1, 1921, and that the remainder of the four payments were advance payments of the annual interest due on November 1, 1921. (See volume 2 of Record, pages 975 and 976.) The complainant did not specificially deny that the conversation with him took place or in any way reply to that testimony, so far as we have been able to find from the record. However, the complainant had already specifically charged in his bill of complaint the truth of Cavanagh's testimony, as shown by the sixth paragraph of this opinion. Those allegations have never been amended or changed in any way and the bill was sworn to by the complainant with the purpose of securing an injunction and a receiver, as prayed in his bill. Those allegations are in these words: "By the terms of the trust deed executed by Hoover to the Chicago Title and Trust Company about October 20, 1920, it is provided that beginning on November 1, 1920, and on the first day of each of the eleven months immediately succeeding thereafter, the mortgagor shall deposit with Wollenberger & Co., at Chicago, for the account of the bondholders, a sum of money which shall be equal to one-twelfth of the total annual interest charges for the year beginning November 1, 1920, and ending October 31, 1921, and there-

after during each year of the indebtedness shall deposit in equal monthly payments on the first day of each month, beginning November 1, 1921, one-twelfth of the total annual interest charges falling due within such yearly periods, respectively, and deposit on November 1, 1920, and on the first day of each of the eleven months immediately succeeding thereafter, a sum which shall equal one-twelfth of the principal due November 1, 1921; that the payments required by the covenants of the trust deed have been paid to and including the month of February, 1921; that Hoover and his co-conspirators failed and refused to make the further payments required, and that by the refusal to pay the payments due in March, April, May and June, 1921, amounting to the sum of $8500, and by the refusal to pay the taxes due to the amount of $2526.26, there is a default on said first mortgage."

Sol Rubin introduced in evidence a statement of account between Wollenberger & Co. and Hoover, delivered to Rubin by Hoover on March 8, 1921, the day the deed of Hoover to Miss Pritikin was executed. Rubin testified that it was a statement from Wollenberger & Co. to Hoover, and that is corroborated by the statement itself which is found at pages 973 and 974 of volume 1 of the record, and the following is a true copy of the statement:

Dr. Ira J. Hoover in acc't with Wollenberger & Co., Chicago, Cr.

| Date | | Price | Amount | Days | Interest |
|---|---|---|---|---|---|
| Oct | 9 | Lafayette Int. 10-20 to 11-20 1 Mo. | 875 | 52 | 8.85 |
| | 29 | Pay-roll | 235.54 | | |
| | | Ashes | 9 | 32 | 1.52 |
| | 30 | Com. Edison Co. | 13.03 | | |
| Nov | 1 | Insurance Laf. | 810.68 | | |
| | | 1 Mo. Int. on $76000 Oct 1-Nov 1 | 443.33 | 29 | 7.14 |
| | 2 | Laf. Ins. $70000 1 year | 145.60 | | |
| | | 60000 1 Yr. 7 Mo. | 198 | 28 | 1.87 |
| | 3 | 1/12 of 10500 & 15000 Laf. 1st Mtg. | 2125 | | |
| | | 1/10 of 1050 Carmen Int. | 105 | | |
| | | 1/10 of 2500 Prin. Due 12-1 | 250 | | |
| | | 1/10 of 700 Int. Clark | 70 | | |
| | | 1/10 of 2000 Prin. Due 12-1 | 200 | | |
| | | 1/10 of 1050 Int. Carmen | 105 | | |
| | | 1/10 of 2500 Prin. Due 10-1 | 250 | | |
| | | 1/10 of 700 Int. | 70 | | |
| | | 1/10 of 2000 Prin. Due 10-1 | 200 | 27 | 17.72 |
| | 22 | Outlays Supt of Water | 39.38 | | |
| | | Coal Laf. Collins & Weiss | 50.35 | 8 | .14 |
| | 27 | Com. Edison Co. | 3.84 | | |
| Dec | 1 | Lafayette Bldg | 2125 | | |
| | | Carmen | 710 | | |
| | | Clark | 540 | | |
| | | 11-1 to 12-1 Int. on $76000 | 443.33 | | |
| | | Interest 7% to date | 15.99 | | |
| | | | 10033.07 | | |
| | | Balance | 5693.29 | | |

Dr. Ira J. Hoover in acc't with Wollenberger & Co., Chicago, Cr.

| Date | | Price | | Amount | Days | Interest |
|---|---|---|---|---|---|---|
| Oct | 29 | Chandler H | Carmen | 300.89 | | |
| | | | Clark | 292.50 | | |
| | | | Lafayette | 40 | 32 | 3.94 |
| Nov | 1 | Clark Int. on 19000 | | 285 | | |
| | | Carmen on 22000 | | 220 | 29 | 2.85 |
| | 3 | 3/4 tax 43594 | Carmen | 326.95 | | |
| | | 3/4 242399 | Lafayette | 1818 | | |
| | | 3/4 56086 | Clark | 420 | 27 | 13.47 |
| | 22 | Chandler H. & Co. | Clark | 390.60 | | |
| | | do | Carmen | 245.84 | 8 | .99 |
| Dec. | 1 | Balance | | 5693.29 | | |
| | | | | 10033.07 | | |

The foregoing statement shows that the complainant charged Hoover under dates of November 3 and December 1 with two advance payments of $2125. The year in which these payments were charged, though not given, was in 1920, as four such payments were all that were made and are the payments that the complainant told Cavanagh he had collected. It shows that he collected from Hoover and appropriated to his own use $4250 of advance payments of principal and interest that under the provisions of section 2, article 4, of the trust deed the complainant or Wollenberger & Co. was to receive "for the account of the bondholders." It also shows that he charged Hoover $875 for advance interest for the Lafayette building under date of October 9, 1920, for one month, from October 20 to November 20, 1920. No such advancement was ever due or required to be paid by the trust deed. The two payments of $2125 were all that the trust deed provided for, as the first installment of bonds fell due on October 31, 1921, and the first and second advance payments were to be made, by the provisions of the trust deed, on November 1 and December 1, 1920. He has credited Hoover with three-fourths of the taxes on the Lafayette building, amounting to $1818, and never has paid one cent of the taxes, for which he was liable by the provisions of the contract of sale, and has never accounted for any of the rents he collected from Chandler, Hildreth & Co. while that company was in possession, before and up to October 22, 1920, so far as we can ascertain. He has charged Hoover with "pay-roll $235.54," "ashes $9," "Com. Edison Co. $13.03," "Outlays Supt. of Water $39.38," "Coal Laf. Collins & Weiss $50.35," and "Com. Edison Co. $3.84," all of which charges apparently pertained to the Lafayette building. No explanation of this statement is made by the complainant in the record, so far as we can find, but it clearly appears from the statement and from the record that he had no right to collect for such charges in this record or for a very large

part of them, and that he has thereby undertaken to evade his own liability to properly account for the two advance payments of $2125 and to avoid the payment of his portion of the taxes for 1920 that he had agreed to pay. Larson and Hoover clearly indicated, and Larson stated in his evidence, that they understood four such advancements were made, and that the total payment thereby made on the bonds was $5000. In selling his interest to Oscar Rubin he indicated by his contracts that the unpaid bonds were $145,000. Larson was in possession of the building from October 23, 1920, to February 8, 1921, by Glaseman and Guarno as his tenants, and those tenants collected the rents and paid the employees, or the "pay-rolls," and it is inconceivable that the complainant had any right whatever to a claim for such charges as he has made in the statement after October 29, 1920, pertaining to the Lafayette building, or for a large part of them.

We also call attention to the purported accounting made by complainant, shown on pages 554 and 555 of this decision. In that statement the complainant has charged interest on both sides of the account, for no apparent reason except the plain fact, as shown by the report, that he would by that method receive more than $560 more interest on his charges than would be received by the receiver on his credits. This report shows that the bonds due on November 1, 1924, were $10,000, and that the receiver paid to the complainant $7000 on November 4, three days after they were due, and that the other $3000 due thereon was paid in payments of $1000 on November 18, 1924, December 8, 1924, and January 2, 1925. Nevertheless, the complainant charged 601 days' interest on the $10,000 of bonds, amounting to $1168.61. The trust deed provides the bonds when they come due shall draw seven per cent interest from their due date, and that the coupons, when they come due and are unpaid, shall draw simple interest from their due date. The charging of interest on the whole amount of the bonds due Novem-

ber 1, 1924, was in direct violation of the provisions of the trust deed and cannot be sustained. Under the trust deed the complainant could collect only three days' interest on $10,000 of bonds. When the second payment of $1000 was made the holder of those bonds was entitled to collect fourteen days' interest on the $3000 that was then past due, and when the third payment was made he was entitled to collect interest on $2000 of the amount then unpaid, and when the fourth payment was made he could collect interest on only $1000 then unpaid, for about twenty-four days. We will here state that the complainant has systematically charged interest on both sides of his accountings in every accounting he has made, so far as we have been able to ascertain the facts, and he has thereby confirmed Larson's evidence to the effect that the complainant informed him that he thought Larson had been "trimming" him and that he was going "to trim" Larson. The evidence shows that the complainant has received more than six times the profits Larson realized, and that means that the profits heretofore shown to the complainant were much more than above shown. Another feature of the complainant's accounting is, that in counting the time he charges interest he puts it into days instead of in years, months and days. This is but another device of his to increase the amount of his interest charges to himself, as he at all times has the largest liability on his side of the accounts. That method of accounting cannot be sustained.

Under the evidence in this record the complainant is clearly liable to account for the benefit of the bondholders for four advance payments of principal and interest of $2125 each, amounting to $8500, and will also be required to pay to Oscar Rubin, by crediting the amount of the net receipts of rents reported by Rubin, the further sum of $1818, the amount of taxes due from him and which his statement shows he charged Hoover. He cannot, under the evidence in this record, be allowed to amend his bill of

complaint and deny the truth of his allegations made, as shown by the sixth paragraph of this opinion. So far as we have been able to ascertain he has not accounted for any of the advance payments so received by him, and if he has, the decree of the chancellor approving his accountings must be set aside and new accountings made by him as herein directed.

The complainant has testified that Chandler, Hildreth & Co. has accounted for and paid all rents collected by that company and received by it while in possession of the Lafayette building as tenants under him. (See vol. 1 of the rec. 421.) It also appears from the testimony of H. L. Schiele, book-keeper of the complainant, that Chandler, Hildreth & Co. paid rents on the building to the complainant beginning September 24 and ending October 22, 1920, amounting to $250.19, but it does not appear that the complainant gave Hoover, Larson or Rubin credit for any part of the rents in his accounting to the court. It also appears that there was a further sum of $40 of rents paid him by that company, but he only accounted for the latter sum in the statement of account of Wollenberger & Co. rendered to Hoover. The complainant on the remandment of this cause should be required to charge himself with all rents collected by Chandler, Hildreth & Co. on the building for any time on and after October 1, 1920, and paid to him, and all rents paid to him by any other persons or occupants of the building, and also to pay, as heretofore stated, the amount of the taxes of 1920 on the building properly chargeable to him, as provided by his bill of sale to Hoover. He should also be required to charge himself with the four advancements of principal and interest received by him, amounting to $8500, and to apply the same on the payment of bonds in his hands, with such interest thereon, if any, as he has caused Rubin to pay by reason of not charging himself with the receipt of the advance-

ments when they were made to him for the account of the bondholders.

The trust deed provides that when a bond or coupon secured by the trust deed is paid in full the complainant shall cancel the same and deliver such bond and coupon to the mortgagor, who is Oscar Rubin, under the definition of terms used in that instrument. When a payment is made on a bond or coupon that is past due the trust deed provides that credit should be endorsed on the bond or coupon, and such bond or coupon ought to be credited in the presence of the mortgagor, Rubin, or his grantee who makes such payment. The complainant has refused to comply with such requirements of the trust deed, and the court on remandment should order him to do so on proper request.

The trust deed provides that when advance payments are made on bonds and coupons the interest on them as to such advancement shall at once cease, and that it is the duty of the complainant or his company to at once pay the bondholders such advance payments. It also provides that when the complainant or his company buys any unpaid bond or coupon he or it acquires the same rights in it as the original holder thereof had.

The decree of July 9, 1924, in favor of the complainant for bonds and coupons owned or purchased by him, was carried into the decree of July 2, 1926, with interest thereon from July 9, 1924, to July 2, 1926, the date of the final judgment. That result gave the complainant interest on interest, which ought to have been avoided. The two judgments should have remained as separate and independent judgments and have been allowed to stand or fall as such. Neither of them can be affirmed for the reasons already stated and both are reversed, and on remandment the court will render two separate judgments, one as of July 9, 1924, for all bonds and coupons owned by him, and for other liens under the trust deed discharged by him prior to the date of that judgment, less all credits for rents

paid him by the receiver or other persons collecting rents. He should also recover as of July 2, 1926, for all coupons bought or owned by him since July 9, 1924, and not included in that judgment, and for all other liens discharged by him under the trust deed and since the judgment of July 9, 1924, and not included in that judgment, less all rents paid him for which he has not previously given proper credit. The decree or judgment of the complainant for purchase money and the decree or judgment of Staver for commission will be subject only to liens of holders of bonds and coupons and other liens under the trust deed for $150,000 or to judgments for such liens, and they are by this decision declared to be prior and superior to all other liens and claims of any other parties to this record, including the Inland Insurance Company of North America. It is the further order of this court that on remandment of this cause the complainant shall proceed without delay to clear the title to the Lafayette building, as he has indicated he would when paid the balance due him for the purchase money. He shall also furnish at his own cost a guaranty policy or policies to be issued by the Chicago Title and Trust Company in its usual form and deliver the same to Oscar Rubin or his grantee when he shall pay the remainder of the complainant's decree or judgment for purchase money and Staver's judgment.

The decree of the circuit court against Fred H. Fitch and the Inland Security Company is affirmed. The decree is also affirmed in so far as it holds that A. D. Hawk, J. C. Doyle, the Bankers' Mortgage Company of Kansas City, I. Ellis Glaseman, Robert Guarno, the Great Western Shade Company, Steven A. Coldren, Sol Rubin and William E. Murawska have no interest in the subject matter of this suit. The decree of the circuit court setting aside the deeds of William S. Miller and wife and Evans Larson and wife to Hoover, the quit-claim deed of Hoover to Anna Pritikin, the trust deed of Anna Pritikin to David K. Cochrane, the warranty deed of Anna Pritikin to Oscar

Rubin, the quit-claim deed of Evans Larson and wife to Oscar Rubin, the trust deed of Oscar Rubin to the Chicago Title and Trust Company, and the general releases from Wollenberger & Co. and Herman Wollenberger to Evans Larson, Larson & Co. and the Larson Construction Company and re-investing title to the Lafayette apartment building in William S. Miller as trustee, and decreeing Oscar Rubin to execute a release deed of the premises to Miller, is reversed. The order of the circuit court of February 1, 1927, for the delivery of the Lafayette apartment building and the furniture and household goods therein to the complainant, Wollenberger, and the widow and heirs of Evans Larson, is reversed, and the complainant and the widow and heirs of Larson should be required to account for all rents and profits of the premises that could have been collected by them by the exercise of reasonable care and prudence during their possession, and the costs and charges for collecting the same should not exceed the cost per month that the collection of rents and profits cost under the receiver; and the complainant shall also account as to how he has applied the rents collected by himself and the widow and heirs of Larson, and report to the circuit court the amount, if any, due to the holders of bonds secured by the $150,000 trust deed.

The decree or judgment against Oscar Rubin in favor of the complainant and the administratrix of Evans Larson for rents and interest thereon for $116,732.02, and the further decree that the equity in the Lafayette apartment building belonged one-half to the complainant and one-half to the administratrix of Evans Larson, and the judgment against Rubin in favor of the administratrix of Evans Larson for $29,913.58 for rents and interest thereon, and also the judgment of the complainant against the administratrix of Evans Larson for $16,391.37 for rents and interest on the same, are all reversed.

The cause is remanded to the circuit court of Cook county, with directions to place the Lafayette apartment building in the hands of a receiver to be appointed by the court pending an accounting between the parties, and with directions to refer the cause to a master in chancery to take evidence and state the account among the parties and for further proceedings consistent with this opinion. The costs in this court will be taxed one-half against the defendant in error Herman Wollenberger, one-fourth against the plaintiff in error Oscar Rubin, and one-fourth against the administratrix of Evans Larson, to be paid in due course of administration.

*Reversed in part and remanded, with directions.*